Rockingham
No. 88-226

RICHARD S. SHORT

v.

SCHOOL ADMINISTRATIVE UNIT NO. 16 & a.

August 14, 1992

*Bernard J. Robertson,* of Exeter, by brief and orally, for the plaintiff.

Soule, Leslie, Zelin, Sayward & Loughman, of Salem (*Barbara F. Loughman* and *Michael S. Elwell* on the brief, and *Ms. Loughman* orally), and *Wiggin & Nourie,* of Manchester (*Richard B. McNamara* on the brief), for the defendants, School Administrative Unit No. 16, Peter Vorkink, John Hodsdon, Renee Galli, and Judith W. Lamphere.

*John P. Arnold,* attorney general (*David S. Peck,* assistant attorney general, on the brief), by brief for the State, as *amicus curiae.*

*Wadleigh, Starr, Peters, Dunn & Chiesa,* of Manchester (*Robert E. Murphy, Jr.,* and *Dean B. Eggert* on the brief), by brief for New Hampshire School Boards Association, as *amicus curiae.*

HORTON, J.    The defendants appeal the denial of their motion to set aside, or for judgment notwithstanding, a jury verdict entered in Superior Court (*Temple,* J.) awarding the plaintiff, Richard S. Short, damages for the defendants' wrongful termination of his employment in violation of State law, as well as of 42 U.S.C. § 1983. We reverse and dismiss the plaintiff's wrongful termination claim brought pursuant to State law because Short's allegation that School Administrative Unit No. 16 (the SAU) terminated his employment after he acted pursuant to a public policy failed, as a matter of law, to articulate a public policy. With regard to Short's section 1983 action, we hold as a matter of law that he did not possess a property interest in his employment contract's renewal and, accordingly, also dismiss his civil rights claim. In view of our holdings on these issues, we need not address the defendants' arguments that the evidence did not support the jury's verdict and that the trial court erred in allowing the jury to award damages for lost investments.

The pertinent facts are not disputed. The State Board of Education (state board) employed Short as a teacher consultant from 1974 until 1979 under a series of year-to-year contracts, and the school board of the SAU employed him as a teacher consultant from 1980 until 1983 under another series of contracts. *See* Laws 1965, 199:2; Laws 1979, 458:1. On May 19, 1982, the SAU joint board voted not to renew Short's employment contract for the 1983-84 school year. (The SAU is comprised of six school districts, five of which have three-member boards and one of which has a seven-member board. These twenty-two members make up the joint board.) The next day, the plaintiff requested a statement of reasons and a hearing to deter-

mine why he was not being renominated. By letter dated June 2, 1982, the plaintiff was notified that his contract would not be renewed, and that his employment would terminate on June 30, 1983. He was also informed that the SAU would not provide him with either a statement of reasons or a hearing with respect to his nonrenewal.

The plaintiff sought the commissioner of education's review, pursuant to the terms of his contract and to the statute that was in effect at that time. *See* Laws 1979, 458:1 (current version at RSA 189:43). A hearing was held on September 30, 1982, during which the parties presented exhibits and offers of proof supporting their respective positions. The commissioner approved the SAU's nonrenewal on November 18, 1982, finding that the employment contract "authorized 'termination' upon one year's prior notice, and did not require *cause* to exist, or be stated." The commissioner further found that there was no evidence that "the nonrenewal was given in bad faith or for any intentionally discriminatory or unlawful purpose," and that the SAU "acted in the proper procedural fashion to end Short's employment" on June 30, 1983. Following the hearing, but prior to the commissioner's report, counsel for Short requested an evidentiary hearing to determine the reasons for the nonrenewal. The commissioner denied this request, noting that the employment contract and the statute required only that he review and determine whether to approve the nonrenewal. *See* Laws 1979, 458:1.

Subsequent to the commissioner's approval of the SAU joint board's decision not to renew Short's contract, the plaintiff filed suit in superior court, alleging that the defendants wrongfully terminated his employment under State law and under federal law, 42 U.S.C. § 1983. The defendants filed several motions for summary judgment, all of which were denied, and a two-week long trial ensued. At its conclusion, the jury returned a special verdict in which it found the defendants liable on both the State and the federal law claims, and found that the plaintiff was entitled to $500,000 in compensatory damages and $4,000 in punitive damages.

The contracts between the plaintiff and the SAU were entitled "Long Term" and provided for an "indefinite period" of employment; however, they also contained a provision concerning termination, which stated:

"F. The sole grounds for termination are:

. . . .

2. By the Unit:

(a) On any anniversary date of the contract upon not less than one year's written notice of termination to the Professional Employee.

. . . .

Provided, however, that termination by the Unit pursuant to this paragraph shall be subject to the review and approval of the Commissioner of Education upon request by the employee."

The statutes regarding termination that were in effect at the time of Short's nonrenewal provided that:

"The school administrative unit board shall have the authority to remove . . . teacher consultants . . . when the interests of the school administrative unit and the schools in the school administrative unit require their removal; provided, however, such removal shall be subject to the review and approval of the commissioner upon the request of the . . . teacher consultant . . . ."

Laws 1979, 458:1. They further stated that: "Any person aggrieved by an order or finding of the commissioner of education may appeal therefrom to the state board, which shall investigate the matter in any way it sees fit and its order shall be final." RSA 186:12 (1977).

Although the plaintiff had a statutory right to appeal the commissioner's decision to the state board, where he would have received a full evidentiary hearing, *see* N.H. ADMIN. RULES, Ed 204.02, he elected instead to commence this action for wrongful termination. When asked during trial why he did not exercise his right to appeal to the state board, Short responded, "I didn't because the Commissioner—they would have reaffirmed the Commissioner's decision. They are lay people appointed by the Governor, and I don't see that they would have any reason to change their opinion. He's given his."

We first address Short's claim under 42 U.S.C. § 1983, in which he asserts he had a due process right under the Federal Constitution to a statement of reasons and a hearing to determine the cause of his contract's nonrenewal, based on an implied contract for continued employment. The defendants argue that the plaintiff did not have a recognized property interest in continued employment, and that the superior court erred in failing to dismiss this claim.

To decide whether the plaintiff had a constitutional right to a statement of reasons for nonrenewal, and a hearing, we must first

determine whether he had a constitutionally protected property right. *Board of Regents v. Roth*, 408 U.S. 564, 569–70 (1972). The United States Supreme Court has stated that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. According to the Supreme Court, a property interest in employment can arise from an implied contract, *Bishop v. Wood*, 426 U.S. 341, 344 (1976), or from a mutually explicit understanding between the employer and employee, *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). State law determines whether or not Short had a legitimate claim of entitlement to the renewal of his contract. *Roth, supra* at 577.

The language of Short's employment contract with the SAU, quoted above, entitles the plaintiff to only two things: (1) written notification at least one year in advance that his employment would end; and (2) at his request, the commissioner's review and determination whether to approve the nonrenewal. Similarly, the applicable statute provided that the SAU could remove a teacher consultant whenever the interests of the SAU required his or her removal, as long as the commissioner, at the employee's request, reviewed and approved the employee's removal. Laws 1979, 458:1. Neither Short's contract nor the statute endowed him with any recognizable property interest in continued employment such that he was constitutionally entitled to a statement of reasons and a hearing.

While Short does not contend on appeal that he had an express contractual or statutory right to continued employment, he alleges, and the jury found, that he had an implied contract for continued employment. The plaintiff testified during trial that when he was initially hired in 1974, the superintendent and "a couple of" state board members told him that if he did a good job, his contract would be renewed. Short testified that he "assumed [he] had . . . a long-term continuing contract, and . . . that [he] should have cause." He asserted that his superior, Superintendent King, assured him that he could expect to have his contract renewed. The plaintiff felt very strongly that if he did his job, his contract would be renewed, and that if it was not renewed, he was entitled to a statement of the reasons why, and a hearing.

It is fundamental contract law that before a contract is made, the parties must agree to the same terms; that is, there must be a meeting of the minds. *Estate of Younge v. Huysmans*, 127 N.H.

461, 465, 506 A.2d 282, 284 (1985). Although the plaintiff testified that the superintendent and "a couple of" state board members told him in 1974 that his contract would be renewed if he did a good job, there is no evidence that the SAU, who became his employer by 1979, ever told him this. The employment contracts Short entered into with the state board, which was his employer until 1978 or 1979, differed from the contracts he entered into with the SAU, which was his employer from 1978 or 1979 until his employment was terminated in 1983. Thus, regardless of what "a couple of" state board members may have represented to the plaintiff in 1974, in the absence of evidence that the SAU ever told Short his contract would be renewed as long as his job performance was satisfactory, neither an implied contract nor a mutually explicit understanding was formed between the plaintiff and the SAU. Instead, the plaintiff's contract rights are governed by the terms of the express contract, which states that the plaintiff is entitled to nothing more than written notification a year in advance that his contract will be terminated and a review by the commissioner.

■■ While Short testified that he "felt" and "assumed" he would be given a statement of reasons and a hearing if his contract was not renewed, his subjective expectations are insufficient to create an implied contract and a constitutionally cognizable property interest in continued employment. *See Clark v. Manchester*, 113 N.H. 270, 274, 305 A.2d 668, 672 (1973) (subjective expectancy of continued employment not protected by procedural due process). Moreover, the law is well settled in New Hampshire that public employment, without more, "does not rise to the level of a protected property right." *Brown v. Bedford School Board*, 122 N.H. 627, 630, 448 A.2d 1375, 1377 (1982).

■ Finally, Short testified that his superior, Superintendent King, assured him that his contract would be renewed if he performed his job properly. The SAU, however, and not Superintendent King, was his employer, and there is no evidence that Superintendent King had any authority to bind the SAU to an implied contract with Short. Thus, despite what Superintendent King might have told him, neither an implied contract nor a mutually explicit understanding between the plaintiff and the defendants could have been created based on Superintendent King's alleged representation. *See Bollow v. Federal Reserve Bank of San Francisco*, 650 F.2d 1093, 1098–1100 (9th Cir.), *cert. denied*, 455 U.S. 948 (1982) (government bank president's unauthorized promise not to terminate employee so long as

his work was satisfactory cannot create constitutionally protected property interest in government employment). We hold as a matter of law that the plaintiff had no cognizable property interest in continued employment with the defendants. His section 1983 claim is dismissed.

Furthermore, even if Short had a protected property interest in continued employment, his section 1983 claim should not have gone to the jury because he was given all the process he was due. That is, Short had a right to a full evidentiary hearing in front of the state board, RSA 186:12 (1977); N.H. ADMIN. RULES, Ed 204.02. Since he chose not to avail himself of this right, he cannot now complain that he was not afforded due process. Short does not appear to contest the neutrality, or the formal adequacy, of the hearing offered him below. Instead, he focuses on the timing of the hearing, arguing that due process entitled him to a hearing prior to the SAU's vote to terminate his employment. Due process, however, would guarantee Short a hearing "before the termination becomes effective," *Bell v. Burson*, 402 U.S. 535, 542 (1971) (emphasis deleted), not before the decision to terminate is made. If a citizen is entitled to a pre-deprivation hearing, that hearing must simply "be granted at a time when the deprivation can still be prevented." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). We note that the commissioner concluded his "review" and "approval" of the SAU's decision on November 18, 1982; Short's employment was due to end on June 30, 1983. Thus, Short had over seven months to request and take part in a full evidentiary hearing before the termination became effective. We find this length of time adequate and, therefore, conclude that even if a protected property interest was at stake, Short was given all the process he was due.

Short also made a claim below that the SAU's actions interfered with his constitutionally protected liberty interests. To respond to this contention, we need only quote from *Board of Regents v. Roth*, 408 U.S. 564, which involved a teacher placed in a predicament almost identical to the one in which Short found himself when the SAU terminated his employment.

"The [SAU], in declining to rehire [Short], did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. . . . In the present case, how-

ever, there is no suggestion whatever that [Short's] 'good name, reputation, honor, or integrity' is at stake. Similarly, there is no suggestion that [the SAU], in declining to re-employ [Short], imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. . . . It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another."

*Roth*, 408 U.S. at 573–75. "Mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" *Id.* at 574 n.13. We dismiss Short's liberty claim.

We now address Short's wrongful termination claim under State law. The SAU argues that this claim should have been taken from the jury and dismissed because Short's allegation that the SAU terminated his employment after he acted pursuant to a public policy failed, as a matter of law, to articulate a violated public policy, an element of Short's claim. Short counters that he did in fact articulate such a public policy, and that the jury properly found in his favor on this issue. We agree with the SAU's position.

■ To support a claim of wrongful termination under State law, a plaintiff must establish two elements: one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn. *Cloutier v. A. & P. Tea Co., Inc.*, 121 N.H. 915, 921–22, 436 A.2d 1140, 1143–44 (1981). Although ordinarily the issue of whether a public policy exists is a question for the jury, at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law, *see id.* at 924, 436 A.2d at 1145, and take the question away from the jury.

Addressing the public policy element of his claim, Short maintains that the SAU voted not to renew his employment because he refused to criticize his superior (Superintendent King) in public. Thus, Short suggests a public policy in favor of remaining loyal to one's supervisor. While such loyalty may be admirable under some circumstances, in this case we hold as a matter of law that it does not form the basis of a public policy because a countervailing public policy

supports the SAU's exercise of its employment and management responsibilities. *See* Laws 1979, 458:1.

■ First of all, an examination of the facts reveals that, in refusing to criticize King in public, Short was refusing to support the SAU, his employer. As Short's employer, it was the SAU, and not King, who had a claim to his loyalty. Thus, Short cannot assert a public policy in favor of refusing to criticize his supervisor, if appropriate, when such criticism is in support of the policy and management objectives of his employer. Further, an employee's expression of disagreement with a management decision is not an act protected by public policy. *See Newman v. Legal Services Corp.*, 628 F. Supp. 535, 539 (D.D.C. 1986) (no clear mandate of public policy prevents termination of employee who disagrees with organizational or managerial ideology of employer); *cf. Bennett v. Thomson*, 116 N.H. 453, 458, 363 A.2d 187, 190 (1976) (State may discharge employee whose policy disagreement with employer impairs his effectiveness and performance).

Secondly, we find the SAU's decision not to renew Short's employment to be just the sort of political decision it was elected to perform, and thus in no way against public policy. All of the SAU members testified that their purpose in seeking office was to effect change in school management and direction. Presumably the voters elected them because they agreed with the candidates' philosophies, but regardless of the electorate's motives, it placed these SAU members in the position of employer to policy-implementing workers. Because one of the SAU's most powerful means of effecting change is to hire employees most in tune with it philosophically, one can hardly say that the decision to terminate the employment of an employee who staunchly opposes these philosophies is against public policy. *Cf. Tice v. Thomson*, 120 N.H. 313, 319, 414 A.2d 1284, 1288 (1980) (plaintiff was member of governor's staff; as such, he served at governor's pleasure, subject to removal by governor without cause). Short, along with all other SAU employees, was hired subject to political extinction, and the SAU had a right to replace him with an employee more sympathetic to its convictions.

■ As detailed above in our analysis of Short's property interest argument, nothing the SAU did in voting not to renew Short's employment violated the terms of his contract or the statutes which governed his employment relation with the SAU. We find that the SAU had not only the discretion, but also the voters' mandate to hire employees most favorably disposed to its educational philosophies

and to let go those opposed. Therefore, we hold that, as a matter of law and under the circumstances of this case, refusing to criticize a supervisor who opposes the views of a public employer cannot form the basis of a public policy. Because a plaintiff must articulate a public policy in order to make out a claim for wrongful termination under State law, this issue should have been taken from the jury and decided in the SAU's favor by the court.

> *Reversed; judgment for the defendants, notwithstanding the verdict.*

BATCHELDER, J., with whom JOHNSON, J., joined, concurred in part and dissented in part; the others concurred.

BATCHELDER, J., concurring in part and dissenting in part: I agree with the majority with respect to the claim under 42 U.S.C. § 1983. Absent a statutory or express contractual provision giving him an expectation of continued employment, the plaintiff had to prove an implied contract for continued employment in order to establish a constitutionally protected property interest, and his testimony failed to do so.

As for the State wrongful termination claim, however, I believe that the majority obfuscates the current state of the law in New Hampshire and that the opinion marks at least a subtle shift from prior law. In *Cloutier v. A. & P. Tea Co., Inc.*, 121 N.H. 915, 924, 436 A.2d 1140, 1145 (1981), the court held that "[t]he existence of a 'public policy' . . . calls for the type of multifaceted balancing process that is properly left to the jury in most instances." The court went on to hold that the public policy question there was properly one of fact for the jury, while stating that "a public policy could *conceivably* be so clear as to be established or not established as a matter of law . . . ." *Id.* (emphasis added).

Here, the jury found (1) that the plaintiff was fired for refusing to criticize his supervisor, and (2) that such loyalty was a basis for a cognizable public policy prohibiting his retaliatory firing therefor. The evidence supports the first finding. To set the verdict aside requires holding that the second was incorrect as a matter of law. The majority reaches this holding in reliance on a legal theory that was rejected by this court in *Cloutier*.

The majority states:

> "Further, an employee's expression of disagreement with a management decision is not an act protected by public policy. *See Newman v. Legal Services Corp.*, 628 F. Supp. 535,

> 539 (D.D.C. 1986) (*no clear mandate of public policy* prevents termination of employee who disagrees with organizational or managerial ideology of employer) . . . ."

(Emphasis added.) The emphasized language from this foreign case is in conflict with *Cloutier*, where this court explained that our prior cases had not restricted the standard to situations involving statutory enunciations of public policy, "[n]or did we use the test now advocated by the dissent of a 'strong and clear public policy.'" *Cloutier*, 121 N.H. at 922, 436 A.2d at 1144. Indeed, the *Newman* case, relied on by the majority, expressly adopts its "clear mandate" test *after* citing contrary case law, including that of New Hampshire, stating, "Other courts [than New Hampshire, *inter alia*] have held that they will recognize the [public policy] exception only where a *clear mandate* of public policy is involved." *Newman*, 628 F. Supp. at 539. Thus, the majority purports to apply settled law when in fact it is departing from the spirit of our prior cases, which allows the jury to find public policy *absent* a "clear mandate."

Not only does the majority alter the law in this manner, but it decides the State claim on the basis of an issue that had not been accepted for briefing by the court. In the defendant's original notice of appeal, fifteen questions were presented for review. The public policy question was included. Upon order of the court following a prehearing evaluation conference, the defendants filed an amended notice of appeal reducing the questions presented to six in number. The public policy question was not among them. This court accepted the case on five of the six questions raised in the amended notice of appeal.

Notwithstanding that we accepted the appeal on the basis of the amended notice, the defendant briefed the public policy issue. Our rules and decisions make clear that issues not raised in the notice of appeal are waived. SUP. CT. R. 16(3)(b); *State v. Peterson*, 135 N.H. 713, 714–15, 609 A.2d 749, 750–51 (1992); *In re "K"*, 132 N.H. 4, 16–17, 561 A.2d 1063, 1071 (1989).

The majority thus deviates from both our established substantive and procedural law, covertly and without providing an explanation for its newly chosen path. I therefore respectfully dissent from that portion of the opinion that reverses the judgment on the State claim of wrongful discharge.

JOHNSON, J., joins in the opinion of BATCHELDER, J.