Morancy v. Hillsboro                    CV-93-399-SD   02/13/95
                 UNITED STATES DISTRICT COURT FOR THE

                      DISTRICT OF NEW HAMPSHIRE


Walter W. Morancy, Jr.


     v.                                  Civil No. 93-300-SD


Town of Hillsboro, New Hampshire;
Herbert R. Hansen, Joseph M. Eaton, Jr., and
Mildred A. Mooney, in their official capacities
 as Selectmen for the Town of Hillsboro, New
 Hampshire;
Frank P. Cate, Chief of Police for the Town of
 Hillsboro, in his personal and professional
 capacities;
Sgt. David Roarick and Corporal David Cahill,
 in both their personal and professional
 capacities;
Leona Nevells



                           O R D E R


     In this civil action, plaintiff Walter W. Morancy, Jr.,

asserts a federal claim for gender discrimination under the

Fourteenth Amendment and 42 U.S.C. § 1983 and state law claims

for wrongful discharge and defamation.

     Presently before the court is a motion for summary judgment

filed by all of the above-listed defendants except Leona Nevells.

<u>Background</u>

Plaintiff Walter W. Morancy, Jr., was hired by the Town of Hillsboro, New Hampshire, as a full-time probationary police officer on August 28, 1992. He began his employment with the police department in October of the same year. Under the terms of his "Conditional Offer of Probationary Employment" agreement, plaintiff's probationary period was to last one year. At the end of the one-year time period, plaintiff would receive a "final offer of employment" provided he had satisfied all of the terms and conditions of employment detailed in the agreement, including successful completion of police officer training at the New Hampshire Police Academy. <u>See</u> Conditional Offer of Probationary Employment (attached to Defendants' Motion as Exhibit 1).

Plaintiff began the ten-week training program at the Police Academy in early January 1993. During this training, plaintiff was required to stay at the Police Academy from Monday morning through Friday afternoon each week, but was allowed to return home during the weekends.

At the end of plaintiff's ninth week of training, during his weekend visit at home, plaintiff became involved in a domestic dispute with Leona Nevells, his live-in girlfriend. Plaintiff asserts that the dispute began because of a discussion regarding the phone bill and because he told Nevells that she was not

2

invited to his Police Academy graduation the following week.

Plaintiff asserts that Nevells

> became very upset at this point. She ripped
> the calendar off the wall. She tried to take
> the phone off the wall, and I expect she was
> going to throw it at me. She took the
> scanner that was on top of the phone, threw
> that at me. Knocked an answering machine
> that was on the shelf off. Took a ski jacket
> that was on the counter and threw it at me.
> At this point she turned around and was in
> the area of some knives that were in the dish
> drainer, there was a dish drainer there on
> the counter, and I just felt that she was a
> little too close to the knives or that she
> was in a state where she was very upset, very
> angry and that she might try pulling a knife
> out. So, I got up and I stood between her
> and the knives.
> I kept trying to ask her to calm down, you
> know, very nicely. I put my hands on her
> shoulders to ask her to please calm down and
> tried to comfort her that way, and she
> reached up near my neck, pushed me back, and
> then pulled me towards her. And with my
> hands still on her shoulders, that's when we
> both fell down on the floor. In a nutshell,
> that's pretty much what happened.

Deposition of Walter W. Morancy, Jr., at 100-01 (attached to Defendants' Motion as Exhibit 2). Plaintiff also states that he used a loud, authoritative "command voice" in order to calm Nevells down during their dispute. Id. at 157-58.

Nevells' recollection of the dispute differs somewhat from Morancy's. Nevells states that during the dispute Morancy told her to "calm the f*** down" and to "get down on the floor." Deposition of Leona Nevells at 44 (attached to Defendants' Motion

3

as Exhibit 3). Nevells further states that Morancy then "shoved" or "pushed" her down onto the floor. Id.; Transcript of Unemployment Compensation Hearing at 33 (Hearing Tr.) (attached to Plaintiff's Objection as Exhibit 3). Nevells denies that Morancy also ended up on the floor. Nevells Deposition at 45. Instead, she claims that "[h]e never got off his feet" during the dispute. Id. Nevells further states that Morancy never hit her during the dispute. Hearing Tr. at 24.

After Morancy had returned to the Police Academy for his final week of training, Nevells, during a telephone conversation with another Hillsboro police officer, told the officer about her domestic dispute with Morancy.

On Wednesday, March 10, 1993, Sergeant David Roarick and Corporal David Cahill, both of the Hillsboro Police Department, interviewed Morancy regarding his domestic dispute with Nevells the previous weekend. After a lengthy interview, during which Roarick and Cahill took turns interrogating him, Morancy filled out a written statement about the incident.

Roarick and Cahill subsequently reported the results of their investigation to Hillsboro Police Chief Frank P. Cate. Cate, in turn, wrote a letter to the Hillsboro board of selectmen recommending that plaintiff be discharged for violating police standards relating to conduct unbecoming an officer and

"truthfulness."  The selectmen, relying on Chief Cate's recommendation, authorized Cate to discharge Morancy.

The following day, just before Morancy was to take his final exam at the Police Academy, he was informed that the Town of Hillsboro had terminated his employment.  As a result thereof, plaintiff was discharged from the Police Academy and was not permitted to take his final exam.

Discussion

1.  Summary Judgment Standard

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

> When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law.

Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

> Even in an employment discrimination case,
> "'where elusive concepts such as motive or
> intent are at issue, summary judgment may be
> appropriate if the nonmoving party rests
> merely upon conclusory allegations,
> improbable inferences, and unsupported
> speculation.'"

Id. at 13 (quoting Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990))).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

3. Equal Protection Claim

In his complaint, plaintiff asserts that he was discharged because of his gender, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

"To prevail in an action brought under 42 U.S.C. § 1983, a plaintiff must show" (1) that he "was deprived of a right, immunity, or privilege secured by the constitution or laws of the United States" and (2) that such deprivation was caused "by a person acting under color of state law." Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir.) (citing Parratt v. Taylor, 451 U.S. 527, 535 (1982)), cert. denied, 502 U.S. 879 (1991).

6

a.  Municipal Liability

A municipality may be held liable as a "person" under section 1983 if the deprivation complained of was caused by the execution of "'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'"  St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988) (plurality opinion) (quoting Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690 (1978)).

In Pembaur v. Cincinnati, 475 U.S. 469, 580 (1986), the Supreme Court made clear "that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."  Such circumstances exist where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Id. at 483-84.

"[T]he identification of policymaking officials is a question of state law."  Praprotnik, supra, 485 U.S. at 124.  "'Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.'"  Id. (quoting Pembaur, supra, 475 U.S. at 483).

7

Under New Hampshire law,

> [t]he selectmen of a town, when they deem it
> necessary, may appoint special police
> officers[1] who shall continue in office during
> the pleasure of the selectmen, or until their
> successors are chosen or appointed.  The
> selectmen may designate one of the police
> officers as chief of police or superintendent
> and as such officer the chief of police or
> superintendent shall exercise authority over
> and supervise or superintend other police
> officers . . . .

New Hampshire Revised Statutes Annotated (RSA) 105:1 (1990).

Plaintiff was discharged by Chief Cates for conduct unbecoming an officer and alleged untruthfulness during the police investigation of the domestic dispute between plaintiff and Nevells.  The termination was authorized by Selectmen Hansen, Eaton, and Mooney.  Affidavit of Herbert R. Hansen ¶ 4 (Defendants' Exhibit 4); Affidavit of Joseph M. Eaton, Jr. ¶ 4 (Defendants' Exhibit 5); Affidavit of Mildred A. Mooney ¶ 4 (Defendants' Exhibit 6).  Under these circumstances, the court finds that the decision to terminate plaintiff was a decision made by the Hillsboro officials responsible for establishing final policy with respect to the firing of the town's police officers.  Accordingly, the decision to fire Morancy is one that

---

[1]The term "special" police officer is used to connote those officers who are appointed rather than elected.  New Hampshire Mun. Workers' Compensation Fund v. Smith, 124 N.H. 526, 531, 474 A.2d 990, 993 (1984).

may give rise to municipal liability under section 1983.


    b.  Unlawful Discrimination

The Equal Protection Clause of the Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  This provision "is essentially a direction that all persons similarly situated should be treated alike." Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).


> Discrimination on the basis of sex violates the equal protection clause if such discrimination does not "serve important governmental objectives" and is not "substantially related to achievement of those objectives."  Davis v. Passman, 442 U.S. 228, 234-35 (1979).  To prove a violation of the equal protection clause, a plaintiff must show that the defendant acted with discriminatory intent.

Lipsett v. University of Puerto Rico, 864 F.2d 881, 896 (1st Cir. 1988).  In the context of equal protection analysis, "'[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)

9

(citation omitted).

In determining whether a plaintiff has made the requisite showing of discriminatory intent in a claim brought under section 1983, the court generally applies the same analytical framework used to make such a determination in cases brought under Title VII.[2]  Lipsett, supra, 864 F.2d at 896-97.  See also St. Mary's, supra note 2, ___ U.S. at ___, 113 S. Ct. at 2746-47 n.1 (assuming "that the McDonnell Douglas framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983").

This framework, originally laid out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), functions "as a means of 'arranging the presentation of evidence.'"  St. Mary's, supra, 113 S. Ct. at 2749 n.3.  The framework does not, however, "set forth immutable guidelines for the decision of all

---

[2]"Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of sex discrimination."  Stratus Computer, supra, 40 F.3d at 15.  The burden of production then shifts to the defendant who must articulate "a legitimate, non-discriminatory reason for its decision" to discharge the plaintiff.  Id. at 16.  If the employer can articulate such a reason, "the presumption of discrimination vanishes, and the burden of production shifts back to the plaintiff.  The plaintiff must then introduce sufficient evidence to support two additional findings: (1) that the employer's articulated reason for the job action is a pretext, and (2) that the true reason is discriminatory."  Id. at 16 (quoting Woods v. Friction Materials, Inc., 30 F.3d 255, 260 (1st Cir. 1994)).  See also St. Mary's Honor Ctr., Inc. v. Hicks, ___ U.S. ___, 113 S. Ct. 2742 (1993).

discrimination cases." Loeb v. Textron, Inc., 600 F.2d 1003, 1010 (1st Cir. 1979); see also Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978) ("The method suggested in McDonnell Douglas . . . was never intended to be rigid, mechanized, or ritualistic."). Instead, the framework merely serves as a guide, which should be applied "to a greater or lesser degree in varying circumstances," Loeb, supra, 600 F.2d at 1010, to determine the ultimate question of "'whether the defendant intentionally discriminated against the plaintiff.'" St. Mary's, supra, 113 S. Ct. at 2753 (quoting United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)). See also Furnco Constr. Corp., supra, 438 U.S. at 577 (the framework "is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination").

Here, the court is presented with a claim of reverse sex discrimination in which plaintiff asserts that he was discharged from his position as a probationary police officer because of his gender. Because the facts of the case do not fit neatly into the structured elements generally required to make out a prima facie case in a traditional sex discrimination action, the court uses the McDonnell Douglas framework here only as a guide in evaluating whether plaintiff has presented sufficient evidence

11

"for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus." Stratus Computer, supra, 40 F.3d at 16.

### c. Plaintiff's Evidence of Discriminatory Intent

The evidence before the court, construed in the light most favorable to the plaintiff, reveals the following. At the time of his discharge, Morancy had been employed by the Hillsboro Police Department as a probationary police officer for approximately four months and was in his tenth week of the ten-week training program at the New Hampshire Police Academy.

During a weekend visit at home between Morancy's ninth and tenth weeks at the police academy, he was involved in a domestic dispute with Nevells, his live-in girlfriend. Nevells reported the incident to a member of the Hillsboro Police Department the following week.

Following the police department's investigation of the incident, which included a lengthy interrogation of Morancy by defendants Roarick and Cahill, the Town of Hillsboro terminated Morancy for violating police standards relating to conduct unbecoming an officer and "truthfulness."

Plaintiff's father, Walter W. Morancy, Sr., spoke with Chief Cate about his son's termination on March 11 because he "wanted

12

to find out what was going on, what happened." Deposition of Walter W. Morancy, Sr., at 30 (attached to Supplement to Defendants' Motion as Exhibit B).  He states that during this meeting Chief Cate "said he was personally worried that a women's right[s] group organization would come and say he didn't do enough, and he could be sued by them."  Id. at 34.

Plaintiff's father and Chief Cate met for a second time on March 12.  Plaintiff's father states that during this meeting Chief Cate stated that "he was still concerned about a women's right[s] group coming in and saying he didn't do enough, so he had to work fast on this one."  Id. at 54.

Chief Cate does not deny making the statements attributed to him by plaintiff's father, but states that

> Mr. Morancy was discharged because engaging in domestic violence is contrary to the principles of conduct becoming a police officer.  I explained to Mr. Morancy at the time of his discharge that domestic violence was not only a critical social problem, but also a significant portion of a police officer's work.  His ability to deal with such situations would be essential to his success in our department.  Engaging in conduct which results in the bruising of his girlfriend, a member of his household, was at a minimum, quite alarming.

Affidavit of Frank P. Cate ¶ 4 (attached to Defendants' Motion as Exhibit 7).

Chief Cate further states that

13

> it is the policy of the Hillsborough Police
> Department to engage potential officers for a
> one-year probationary period during which
> their conduct, training, progress and
> suitability are scrupulously monitored, not
> only by supervising officers in my
> department, but also by the officials at the
> New Hampshire Police Academy.
>   Mr. Morancy was discharged during the
> probationary period because of his failure to
> comply with police standards.

Id. at ¶¶ 5-6.

To prevail on his section 1983 claim, plaintiff has the burden of proving that the defendants intentionally discriminated against him. St. Mary's, supra, 113 S. Ct. at 2753. In other words, plaintiff must produce sufficient evidence for a reasonable jury to find that he would not have been fired but for his gender. Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. 1990). See also Villanueva v. Wellesley College, 930 F.2d 124, 128 (1st Cir.) ("to defeat summary judgment, the plaintiff must introduce evidence that the real reason for the employer's action was discrimination"), cert. denied, 502 U.S. 861 (1991).

The evidence presented by plaintiff to establish that he was terminated because of his gender is limited to his father's testimony of the statements made by Chief Cate. The court finds that this evidence is, as a matter of law, insufficient to allow a reasonable jury to find that the defendants acted with

14

discriminatory intent when they terminated plaintiff's employment. Defendants' motion for summary judgment is therefore granted as to plaintiff's equal protection claim.

### 3. Wrongful Discharge

In order to maintain a wrongful discharge claim under New Hampshire law, a plaintiff must establish two elements:

> one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn.

Short v. School Admin. Unit No. 16, 136 N.H. 76, 84, 612 A.2d 364, 370 (1992) (citing Cloutier v. A & P Tea Co., Inc., 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981)).

"[O]rdinarily the issue of whether a public policy exists is a question for the jury." Id., 136 N.H. at 84, 612 A.2d at 370 (citing Cloutier, supra, 121 N.H. at 924, 436 A.2d at 1145). However, "at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law and take the question away from the jury." Id. (citation omitted).

Public policy exceptions giving rise to wrongful discharge actions may be based on statutory or nonstatutory expressions of

15

public policy. <u>Cloutier</u>, <u>supra</u>, 121 N.H. at 922, 436 A.2d at 1144. However, "'unless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause.'" <u>Id.</u>, 121 N.H. at 920, 436 A.2d at 1143 (quoting <u>Pierce v. Ortho Pharmaceutical Corp.</u>, 417 A.2d 515, 512 (N.J. 1980)).

In his complaint, plaintiff alleges that his

> discharge was wrongful because to the extent the plaintiff was dismissed because of the domestic disturbance with the defendant Nevells, his handling of the disturbance was in accordance with the training he was receiving at the N.H. Police Academy. In handling the disturbance, plaintiff first used a command voice. When that was ineffective, he used appropriate, measured physical restraint. To be dismissed from his employment for using the training he was receiving is tantamount to being discharged for doing that which public policy encourages.

Complaint ¶ 73.

Defendants contend that summary judgment should be granted as to plaintiff's claim for wrongful discharge because plaintiff's use of his police training in handling a domestic disturbance in his own home is not an act which public policy would encourage. In support thereof, defendants submit the affidavit of Chief Cate, who states,

> I have . . . made myself familiar with Mr. Morancy's claim that his discharge was based in part upon his furtherance of a public

16

> policy encouraging the use of police tactics to deal with members of the officer's own household. Far from being a part of public policy, and based upon my twenty years of experience as a law enforcement officer, responsible police chiefs advise their officers to the contrary. Police officers such as Mr. Morancy, especially since he was a novice with no "on-the-street" experience, should leave their "police presence," "command voice" and similar tactics in their patrol car when they leave the shift.

Cate Affidavit ¶ 3.

Police officers receive training to help them deal with the wide range of situations they may encounter as police officers, including domestic disturbances. Plaintiff explained during his deposition that at the police academy "they teach you that there's different levels of force, and one is officer presence, two is command voice, and three is, I think, physical, and four is something else, and I think the fifth one is deadly force." Deposition of Walter W. Morancy, Jr., at 157.

When a police officer is called upon to respond to a domestic dispute between two individuals, he utilizes his police training to diffuse or resolve the situation he encounters. Such a situation is markedly different from the one presented in this case, where the police officer himself was a party to the domestic disturbance. Under these circumstances, the court finds, as a matter of law, that plaintiff's use of police tactics during a domestic disturbance in which he is an involved party is

17

not an act that public policy would encourage.

Defendants' motion for summary judgment is therefore granted as to plaintiff's wrongful discharge claim.[3]


## 4.  Defendant Leona Nevells

Plaintiff's complaint asserts a state-law claim for defamation against Leona Nevells.  Defendant Nevells was served with a summons and copy of the complaint on July 6, 1993, but has failed to file an appearance or response in accordance with the requirements of Rule 12(a), Fed. R. Civ. P.  Plaintiff filed a timely motion for entry of default (document 3), but subsequently

---

[3]In arguing that his wrongful discharge claim should survive defendants' summary judgment motion, plaintiff relies on the case of Clark v. Manchester, 113 N.H. 270, 305 A.2d 668 (1973), which addresses the question of whether a probationary police officer's due process rights were violated by his discharge.  Citing Clark, plaintiff asserts that he "believes he can prove that the manner in which he was dismissed, without a hearing, has seriously damaged his standing and associations in the police community. He believes he can prove[] that he has been stigmatized and that future opportunities to become a police officer have been severely curtailed."  Plaintiff's Objection at 7.

To the extent that plaintiff is attempting to base his wrongful discharge claim on the contention that his discharge deprived him of a liberty interest without due process, the court finds that said claim fails.  When faced with a motion for summary judgment, plaintiff must do more than state that he "believes he can prove" his claim.  Instead, he must come forward with "'definite competent evidence' [to fortify his] version of the truth."  Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993) (quoting Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 2965 (1992)).  Plaintiff has failed to produce any such evidence in support of the due process claim he alludes to in his objection.

withdrew that motion (document 6).  Accordingly, this action is hereby dismissed as to defendant Nevells for failure to prosecute.  See Local Rule 21(c).

Conclusion

For the reasons set forth herein, defendants' motion for summary judgment is granted, and this action is dismissed as to defendant Nevells for failure to prosecute.  The clerk shall enter judgment accordingly.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

February 13, 1995

cc:  R. Peter Decato, Esq.
     Robert E. McDaniel, Esq.

19