Birkmaier v. Rockingham Venture        CV-94-429-SD  09/07/95
                 UNITED STATES DISTRICT COURT FOR THE

                     DISTRICT OF NEW HAMPSHIRE


George James Birkmaier


     v.                                    Civil No. 94-429-SD


Rockingham Venture, Inc., d/b/a
 Rockingham Park;
Robert DeStasio



                           O R D E R


     In this diversity action, plaintiff George James Birkmaier

seeks recovery from his former employer, Rockingham Venture,

Inc., d/b/a Rockingham Park (Rockingham), and Robert DeStasio,

Rockingham's Director of Racing, for wrongful discharge and

asserts a companion claim against defendant DeStasio for tortious

interference with contractual relations.[1]

     Presently before the court is defendants' motion for summary

judgment, to which plaintiff objects.

_____

     [1]Plaintiff originally filed a third claim for breach of
implied contract (Count II), which the court now notes has been
waived by plaintiff as of August 31, 1995.  See Plaintiff's Pre-
Trial Statement ¶ M.

<u>Background</u>

From approximately 1987 through the 1993 racing season, Birkmaier was employed by Rockingham as the custodian of the jockeys' room. In this position, plaintiff was responsible for supervising ten valets, the individuals who saddle and unsaddle the racehorses, and was himself supervised by, among others, defendant DeStasio.

During the 1993 racing season,[2] plaintiff alleges that defendant Robert DeStasio would leave the racetrack early, occasionally taking Steven Watson, one of Birkmaier's valets, with him to play a round of golf. Affidavit of George James Birkmaier ¶ 3 (attached to Plaintiff's Objection). When Watson was absent, the remaining valets had to cover his responsibilities, which resulted in "more work for everyone who was left behind." <u>Id.</u> ¶ 4. Consequently, Birkmaier asked DeStasio to "at least give me some advance warning when he planned to take Mr. Watson out to play golf, so that I could get a substitute." <u>Id.</u> ¶ 6.

On an unspecified Monday in September 1993,[3] DeStasio

---

[2]Since the 1992 racing season, Rockingham only runs live horse races between the months of April and October. Prior to this schedule change, Rockingham would run horse races throughout the year. <u>See</u> Defendants' Pretrial Statement ¶ A.1.

[3]The court notes that all parties are unable to identify the particular day in question more precisely.

2

inquired of plaintiff whether he could take Watson out golfing. Since plaintiff was "already short at least one valet," he indicated that "it was not a good day." Id. ¶ 5. However, when Birkmaier returned from lunch, the jockeys' room valets informed him that DeStasio had in fact relieved Watson of his valet duties and taken him out golfing. Id. ¶ 7.

Upon learning of this situation, plaintiff asserts that he first went to DeStasio's office, but found same to be locked and unoccupied. He thereafter discussed the situation with Leo Pambianchi, the Racing Secretary; Edward Callahan, the General Manager of Rockingham Park; and James Gigliotti, the Clerk of Scales. Id. ¶ 9; Deposition of George James Birkmaier at 152-55 (attached to Defendants' Memorandum of Law). Birkmaier allegedly told Callahan that the situation with DeStasio and Watson was neither "right" nor "fair," and "that something needed to be done." Birkmaier Affidavit ¶ 9. Callahan indicated that he would speak to DeStasio about the situation. Id.

Since no live racing took place on Tuesdays, Birkmaier returned to work on Wednesday and received an allegedly hostile and profane telephone call from DeStasio. After inquiring whether plaintiff had spoken with Callahan and the substance of said conversation, plaintiff asserts that DeStasio told him, "One of us will be back here next year, and I'm sure it won't be you.

3

This place isn't big enough for both of us.  I'll show you who runs this place."  Id. ¶ 11.

The remainder of the 1993 racing season passed without incident, and as had been the case at the end of the 1992 season, plaintiff was laid off by Rockingham but "fully expected . . . [to] be brought back for the 1994 season."  Id. ¶ 15.  However, plaintiff received a letter from DeStasio, on behalf of Rockingham, in February 1994 informing him that "Management has decided to make some changes and we will no longer be in need of your services."  February 7, 1994, letter from DeStasio to Birkmaier (attached as Exhibit A to Plaintiff's Memorandum of Law).[4]  Birkmaier personally spoke with Callahan, Assistant General Manager Leonard Dill, and DeStasio about the decision to not rehire him for the 1994 season, but these efforts proved unsuccessful.  Birkmaier Affidavit ¶¶ 16-17.

## Discussion

### 1.  Summary Judgment Standard

Summary judgment shall be ordered when "there is no genuine

[4]The court notes that Gigliotti was likewise not rehired by Rockingham for the 1994 racing season.  Deposition of Leo James Pambianchi at 35 (attached to Defendants' Memorandum of Law).  Instead, former valet Watson was rehired by Rockingham to fill the Clerk of Scales position for 1994.  Id. at 13 (attached to Plaintiff's Memorandum of Law).

4

issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Stone & Michaud Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

Although "motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal," Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994), the entire record will be scrutinized in the light most favorable to the nonmovant, with all reasonable inferences indulged in that party's favor, Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994), cert. denied, ___ U.S. ___, 115 S. Ct. 1958 (1995); see also Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994); Maldonado-Denis, supra, 23 F.3d at 581.

"In general . . . a party seeking summary judgment [is required to] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific

5

facts demonstrating that there is, indeed, a trialworthy issue." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)), cert. denied, ___ U.S. ___, 115 S. Ct. 2247 (1995).

> A "genuine" issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party. Maldonado-Denis, 23 F.3d at 581. In other words, a genuine issue exists "if there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" Id. (quoting Garside [v. Osco Drug, Inc.,] 895 F.2d [46,] 48 [(1st Cir. 1990))]. A "material" issue is one that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Libertad v. Welch, 53 F.3d 428, 435 (1st Cir. 1995).

Although summary judgment is inappropriate when a trialworthy issue is raised, "[t]rialworthiness necessitates 'more than simply show[ing] that there is some metaphysical doubt as to the material facts.'" National Amusements, supra, 43 F.3d at 735 (quoting Matsushida Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (alteration in National Amusements). Thus, "'[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve . . . .'" Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir.

6

1989)). Accordingly, "purely conclusory allegations . . . rank speculation . . . [or] improbable inferences" may be properly discredited by the court, id. (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)), and "'are insufficient to raise a genuine issue of material fact,'" Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (quoting August v. Offices Unlimited, Inc., 981 F.2d 576, 580 (1st Cir. 1992)).

2. Wrongful Termination

Plaintiff's primary allegation is that Rockingham's decision not to rehire him for the 1994 racing season constituted a wrongful termination. As applied in New Hampshire,

> in order to establish a claim for wrongful termination an employee must establish two elements: "one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn."

Kopf v. Chloride Power Elecs., Inc., 882 F. Supp. 1183, 1189 (D.N.H. 1995) (quoting Short v. School Admin. Unit No. 16, 136 N.H. 76, 84, 612 A.2d 364, 370 (1990) (citing Cloutier v. A & P Tea Co., 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981))). Defendant moves for summary judgment on the ground that the sum of plaintiff's evidence is insufficient to prove that he was

7

terminated for performing acts which public policy would encourage.

### a. Bad Faith, Malice, or Retaliation

Insofar as "'a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract,'" Cloutier, supra, 121 N.H. at 920, 436 A.2d at 1143 (quoting Monge v. Beebe Rubber Co., 114 N.H. 130, 133, 316 A.2d 549, 551 (1974)), "there is an implied covenant in every contractual relationship that the parties will carry out their obligations in good faith," id. (citations omitted). Correspondingly, "the manner in which the plaintiff was discharged" may serve as the underlying predicate for a finding of bad faith. Id., 121 N.H. at 921, 436 A.2d at 1144.

By medium of sworn affidavit, plaintiff presents his recollection of the telephone conversation that took place between DeStasio and himself following his discussion with Callahan. Plaintiff avers that at some point during said conversation DeStasio threatened, "One of us will be back here next year, and I'm sure it won't be you. This place isn't big enough for both of us. I'll show you who runs this place."

Birkmaier Affidavit ¶ 11.

In the view of the court, this evidence alone is sufficient to create a genuine issue of material fact as to whether Rockingham, by and through DeStasio, acted in bad faith in not rehiring plaintiff.

### b.  The Public Policy Element

"Although the existence or nonexistence of a public policy is ordinarily a question of fact for a jury, the court may, when appropriate, rule as a matter of law whether a public policy does or does not exist."  Id. (citing Short, supra, 136 N.H. at 84, 612 A.2d at 370); accord Bourque v. Town of Bow, 736 F. Supp. 398, 402 (D.N.H. 1990) ("[w]here it is clear that plaintiff cannot articulate an expression of public policy as a matter of law, there is no fact question for the jury to decide") (internal quotation omitted).  However, because "[t]he existence of a 'public policy' . . . calls for the type of multifaceted balancing process that is properly left to the jury in most instances," Cloutier, supra, 121 N.H. at 924, 436 A.2d at 1145, the court will take this issue away from the jury only when no reasonable juror could find the existence of a public policy expression.

Moreover, any public policy determination must further take

9

into account and balance an "'employer's interest in running his business as he sees fit . . . [with] the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two . . . .'" Id., 121 N.H. at 920, 436 A.2d at 1142-43 (quoting Monge, supra, 114 N.H. at 136, 316 A.2d at 551).

Although plaintiff casts about various purported public policies,[5] those so identified fall short of the governing standard. However, plaintiff's burden on summary judgment is not to conclusively prove his case, but rather simply to demonstrate that a genuine issue remains over a fact that is material to the outcome of the litigated issues. Plaintiff does raise the inference that his termination was in retaliation for speaking out about DeStasio's conduct. See Plaintiff's Objection at 7 ("Mr. Birkmaier has unquestionably presented sufficient facts to demonstrate that he was terminated in retaliation for voicing his complaints about Mr. DeStasio to Edward Callahan, the general manager of Rockingham Park."). It is clear to this court that

---

[5]Among those suggested by plaintiff are that DeStasio's conduct (1) undermined Birkmaier's authority over the valets; (2) constituted gross favoritism and preferential treatment for an employee; (3) created a legitimate safety concern when an already shorthanded valet staff had to accommodate Watson's absence; and (4) amounted to a falsification of records and misappropriation of company funds in that Watson was paid a full day's wages without actually working the hours.

10

were it to be demonstrated that Birkmaier was in fact discharged as a consequence of his speaking out to an ultimate supervisor about the questionable actions of a mid-level supervisor, then such a discharge would not be "in the best interest of the economic system or the public good . . . ." Vandegrift v. American Brands Corp., 572 F. Supp. 496, 498 (D.N.H. 1983) (interpreting holding of Monge, supra).

Citing two earlier cases decided by this court, e.g., Bourque, supra, and Mellitt v. Schraftt Candy Co., Civ. No. 80-513-D, 1981 WL 27284 (D.N.H. Dec. 21, 1981), defendant argues that "plaintiff's disagreement with his supervisor's conduct does not implicate a public policy." Defendant's Memorandum of Law at 8. Indeed, this court has previously recognized that,

> [a]n employer is at liberty to determine that the continued employment of an individual who has expressed a sincere and good faith disagreement with a company policy is not in the best interests of his or her business. Under the circumstances, it is not the province of the Court to examine the wisdom of the employer's business practice.

Mellitt, supra, slip op. at 9-10 (emphasis added). Accord, Bourque, supra, 736 F. Supp. at 402 ("'a discharge for business reasons is not actionable'" (quoting Vandegrift, supra, 572 F. Supp. at 499)); Vandegrift, supra, 572 F. Supp. at 499 (recognizing that "although discharge may be harsh, unfair, or without good cause," no action for wrongful termination will lie

11

"unless there is a sufficient showing to support a factual finding that the management decision in question is contrary to a public policy . . . .").

The "management decisions" at issue in Mellitt, Bourque, and Vandegrift--respectively, consolidation of two corporate marketing divisions; Selectboard's failure to "appropriately" investigate complaints about supervisor's harassment; and discharge for purchasing promotional tobacco supplies from wholesalers at discount prices while seeking reimbursement from the employer at a higher wholesale price despite the employer's instruction to do so--are arguably distinct from the management decision implicated herein.

To be sure, the jury may find that Birkmaier was discharged due to management's dual concerns about the cleanliness of the jockeys' room and the alleged conflict between plaintiff and the Clerk of Scales, James Gigliotti. Discharge under such circumstances is grounded upon sound business reasons. However, the jury may be equally inclined to find that defendant discharged plaintiff in direct retaliation for his speaking out about the DeStasio/Watson golf outings. Such retaliatory discharge, when motivated by bad faith, contravenes sound public policy principles.

Due to this general equipoise, defendant's motion for

12

summary judgment on the issue of wrongful termination (Count I) must be and herewith is denied.

3. Tortious Interference with Contractual Relations

Plaintiff finally contends that he had an advantageous economic relationship with Rockingham, of which defendant DeStasio was aware but nonetheless "intentionally and improperly interfered with plaintiff's employment relationship . . . by firing plaintiff from employment." Complaint ¶¶ 26-28. Defendant asserts that such claim must fail as a matter of law either because (1) plaintiff cannot establish that he had an "economic relationship" with Rockingham or (2) as an employee of Rockingham acting within the scope of his employment, DeStasio is not a "third party" vis-a-vis plaintiff and Rockingham.

As previously recognized by this court,

> "[t]he elements necessary successfully to plead a cause of action for tortious interference with contractual relations are 'that (1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant *intentionally* and *improperly* interfered with this relationship; and (4) the plaintiff was damaged by such interference.'"

Soltani v. Smith, 812 F. Supp. 1280, 1296 (D.N.H. 1993) (quoting Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46, 534 A.2d 706, 709

13

(1987) (quoting <u>Emery v. Merrimack Valley Wood Prods.</u>, 701 F.2d 985, 988 (1st Cir. 1983))); <u>accord</u> <u>Roberts v. General Motors Corp.</u>, 138 N.H. 532, 539, 643 A.2d 956, 960-61 (1994) ("In order to bring a claim for tortious interference, the plaintiff must show that he had a contractual relationship with [Rockingham] of which [DeStasio] was aware; that [DeStasio] wrongfully induced [Rockingham] to breach that contract; and that the damages claimed were proximately caused by that interference." (citing <u>Montrone v. Maxfield</u>, 122 N.H. 724, 726, 449 A.2d 1216, 1217 (1982)).

Of the four requisite elements, the satisfaction of two are undisputed--DeStasio certainly knew of the relationship between plaintiff and Rockingham and, further, Birkmaier has suffered some damages as a result of the alleged interference. Whether DeStasio's conduct was "intentional and improper" is a matter the resolution of which is better left to the jury. However, plaintiff's tortious interference claim will not reach the jury should the two-part threshold inquiry--whether "plaintiff had an <u>economic relationship</u> with a <u>third party</u>--proves insurmountable in light of the instant facts.

a.   <u>Presence of an Economic Relationship</u>

Defendant contends that plaintiff's economic relationship

14

with Rockingham terminated with the October 1993 personnel action. Taking the fact that plaintiff filed a claim for unemployment compensation as an acknowledgement that he was unemployed as of October 1993, defendant concludes that "[p]laintiff therefore had no 'economic relationship' with Rockingham Park with which defendant DeStasio could interfere in February 1994." Defendants' Memorandum of Law at 10.

However, plaintiff has submitted excerpts from the depositions of Leo Pambianchi and Edward Callahan as well as a copy of his Rockingham wage/salary history record, which, in combination, raise a genuine issue concerning plaintiff's "economic relationship" with Rockingham in the months after October 1993. More specifically, Pambianchi and Callahan both indicated that somewhere between 85 to 95 percent of Rockingham's seasonal employees are rehired for the following season. See Pambianchi Deposition at 13 (attached to Plaintiff's Objection); Deposition of Edward M. Callahan at 20 (attached to Plaintiff's Objection). Furthermore, plaintiff's "Confidential Wage-Salary History" record indicates that Rockingham distinguished between a lay-off and a termination. See Confidential Wage/Salary History of George Birkmaier (attached to Plaintiff's Objection) (indicating separate entries for October 9, 1993, lay-off and February 7, 1994, termination).

15

In consequence thereof, the court is unable, as a matter of law, to rule that no "economic relationship" existed between plaintiff and Rockingham in the months between October 9, 1993, and February 7, 1994.


### b.   Is DeStasio a Third Party?

Defendant correctly notes the general rule that "a co-employee acting as an agent of the employer cannot be a third party for the purposes of interfering with the contract between the plaintiff and the corporate employer."  Defendants' Memorandum of Law at 11 (citing <u>Alexander v. Fujitsu Business Communication Sys., Inc.</u>, 818 F. Supp. 462, 470 (D.N.H. 1993) (DiClerico, J.)).  However, DeStasio will not be found to have been acting within the scope of his employment if his decision to terminate Birkmaier "'was motivated by actual malice', where 'actual malice' is defined as 'bad faith, personal ill-will, spite, hostility, *or a deliberate intent to harm the plaintiff*.'" <u>Soltani</u>, <u>supra</u>, 812 F. Supp. at 1297 (quoting <u>Piekarski v. Home Owners Sav. Bank</u>, 956 F.2d 1484, 1495 (8th Cir.), <u>cert. denied</u>, ___ U.S. ___, 113 S. Ct. 206 (1992)) (other citation omitted) (emphasis in <u>Soltani</u>); <u>accord</u> 8 STUART M. SPEISER, ET AL., THE AMERICAN LAW OF TORTS § 31:41, at 1260 (1991) ("Dependent on many factors, .

16

. . [but principally stressing good faith and an individual's own self interest], a director, officer, or an employee of a corporation may be subject to liability for tortious interference with the corporation's contract with a third person.").

In view of the authorities cited herein, and based on the evidence the court has before it, the court finds that plaintiff has presented evidence sufficient for a reasonable jury to find that when DeStasio allegedly interfered with plaintiff's contractual relations, he was motivated by "bad faith, personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff." Piekarski, supra, 956 F.2d at 1495 (citation omitted). Accordingly, as in Soltani, "the court finds that, under Piekarski, [Rockingham] was a third party with respect to the relationship[] between plaintiff and . . . defendant [DeStasio]." Soltani, supra, 812 F. Supp. at 1297. Defendant's motion for summary judgment on plaintiff's claim for intentional interference with contractual relations (Count III), therefore, must be and herewith is denied.

17

## Conclusion

For the reasons set forth herein, defendants' motion for summary judgment (document 7) is denied.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

September 7, 1995

cc:  Andrew D. Wickwire, Esq.
     Mark T. Broth, Esq.

18