Peck v. NGM Insurance                     CV-94-90-B     06/21/95
                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE

Kathleen Peck

        v.                                 Civil No. 94-90-B

NGM Insurance Co., et al


                           **O R D E R**

        Plaintiff, Kathleen Peck, filed this action against the

defendants, NGM Insurance Company ("NGM") and several of its

employees, alleging violations of both federal and state law.

Peck alleges that NGM violated the Equal Pay Act, 29 U.S.C.A. §

206(d) (West 1978) and its New Hampshire counterpart, N.H. Rev.

Stat. Ann. § 275:37 (1987) (Count I), and the Fair Labor

Standards Act, 29 U.S.C.A. § 207(a) (West Supp. 1995) (Count II).

She also alleges that NGM is liable for wrongful discharge (Count

III) and negligent supervision (Count VI).  Finally, she claims

that several NGM employees[1] intentionally interfered with her

contractual relations with NGM (Count IV),  and that NGM is

liable for the individual defendants' actions under the doctrine

_____

        [1]The individual defendants are Samuel DeYoung, Robert
Buchholz, and John Schwartz.

of respondeat superior (Count VII).[2]  Defendants filed a motion for summary judgment with respect to all of Peck's allegations. For the following reasons I grant defendants' motion in part and deny it in part.

## I.  **FACTUAL BACKGROUND**[3]

NGM is an insurance company that underwrites both commercial and personal insurance lines.  Its Risk Inspection Department performs inspections of commercial properties and verifies basic information of insured parties' businesses.  NGM hired Peck in 1977 as a secretary in the Risk Inspection Department.  Samuel DeYoung, a risk manager, was her initial supervisor.[4]  At that time, the department included DeYoung, two male field inspectors and Peck.  In 1984, the department was downsized to include only DeYoung, whose title was changed to risk inspection supervisor, and Peck whose title was changed to risk inspection assistant.

_____

[2]Peck withdrew Count V of her complaint, alleging intentional infliction of emotional distress, in her objection to defendants' motion for summary judgment.

[3]These facts are stated in the light most favorable to Peck.

[4]DeYoung ceased to be Peck's supervisor in the mid-1980's and, as discussed _infra_, he later resumed a supervisory role over her.

2

DeYoung was categorized as a pay grade 22 while Peck was a grade 15.

As a risk inspection supervisor, DeYoung was responsible for identifying liability exposures of applicants for commercial lines insurance who operated their businesses from a specific location (e.g., office buildings, light manufacturing plants, apartments, stores, and restaurants). DeYoung performed this responsibility both by making on-site inspections and by interviewing business owners. After completing an investigation, DeYoung prepared a detailed narrative report that included a description of the site, the business's operations, and any potential liability hazards. His reports also included diagrams, photographs, and recommendations for corrective action.

Peck's duties as a risk inspection assistant changed during the time she was employed at NGM. Initially, she was responsible for (i) acting as liaison between NGM and independent contractors who performed risk inspections for NGM; (ii) assisting DeYoung with his field inspections; (iii) using information obtained by DeYoung to determine the value of an insured's buildings; and (iv) providing clerical and technical support to underwriters. At some point, she also began to perform "telephone inspections" of contracting operations such as plumbers, electricians, general

3

contractors, or landscapers who were seeking to purchase insurance from NGM. By 1989, she was performing telephone inspections almost exclusively. At that time, she was assigned a split shift of four hours in the morning and four hours in the evening. In 1989, she was allowed to perform the telephone inspections from her home.

Peck's telephone inspections were essentially interviews of the business owners that followed a prescribed format. She was required to determine the nature and extent of an applicant's business by collecting information such as: (i) a description of the business; (ii) its yearly sales figures and annual payroll numbers; (iii) the names and numbers of its employees; (iv) a description of the business's equipment; (v) the average price of a job; (vi) whether the insured used subcontractors; (vii) the number of vehicles used by the business; (ix) any risks associated with the business's buildings; (x) whether the business had underground storage tanks on its premises; (xi) whether the business performed any ultra-hazardous activities; and (xii) whether the business had suffered any losses within the previous three years. Peck recorded the information she obtained on a one-page form and used additional pages to supplement the form where necessary.

4

Peck prepared approximately thirty-five to forty reports per week and it took her approximately forty-five minutes to conduct each interview and prepare a report. Although she spent most of her time conducting telephone interviews, Peck was also required to attend six staff meetings per year and to assist NGM's underwriters with "rush" jobs at a minimum of once per week. If Peck was not on the telephone performing these other tasks or at company meetings, she considered herself to be actively waiting for work. Peck estimated that her typical work day lasted from 6:00 a.m. until 8:00 p.m. if this waiting-to-work time were included.

Peck's flexibility in responding to calls during off hours was considered a major strength by NGM. Further, a supervisor indicated that she was doing an excellent job and that NGM's insureds were fortunate because she was available at their convenience. She was also cited as having a good work ethic and "a passion for doing everything right."

Peck inquired about becoming a field inspector several times during her employment. She was told both that due to downsizing there were no positions available and that she lacked the requisite experience and training. DeYoung indicated to her that he did not think it would be appropriate for a woman to perform

5

field inspections because of the areas where the inspections were conducted. Peck also applied for other positions, including mail room supervisor, but was unsuccessful in securing a new position.

In January 1993, Peck expressed to Thomas Aldrich, a human resources representative, that she felt overwhelmed and that she was working all the time, fourteen hours per day. Previously, Peck had expressed similar concerns to other supervisors and managers at NGM. According to Peck, no one at NGM ever told her she should not be working those hours. She also did not believe she could work a split shift since she was required to be available during business hours to underwriters and agents. Peck, however, never indicated on her time slips or evaluations that she worked any overtime.

In February 1993, Robert Buchholz became the New England Regional Underwriting Manager and managed both DeYoung and Peck. At this time, Peck began working part-time at Friendly's in addition to her work for NGM. During a conversation with Buchholz after he became one of her supervisors, Peck stated that she was "burnt out" and she did not like being in the house all day waiting for insured parties to call her back. Thereafter, Buchholz assigned a task force to reformulate the verification

6

forms Peck was using and after Peck left NGM, the forms were revised so that they could be sent directly to insureds. Buchholz also expressed concern about Peck's hours in a memo to DeYoung and instructed him to monitor Peck's phone activity to determine when she was experiencing the most "no hits" in order to revise her schedule.

Pursuant to Buchholz's instructions, DeYoung requested the master pages of Peck's phone bill to verify that she was deducting all her personal calls from the bill. He asked more than once for the pages and Peck explained to him each time why she could not give him past pages. Peck felt that his repeated requests were "nit-picky." After completing his review, DeYoung made recommendations to Buchholz as to the most productive times for making calls. Previously, Peck had been told to take Friday afternoons off, but beyond that modification, no one assisted Peck in restructuring her schedule.

On September 22, 1993, at 9:25 a.m., DeYoung again asked Peck for the master page of her phone bill. Peck again explained why she could not provide the master page and again asked DeYoung why he was being so "nit-picky" lately. She also asked him if he

7

was doing to her what another worker used to do to his "girls."[5]
She further asked whether NGM wanted her to resign. DeYoung told
Peck that he would find out for her and get back to her that day.
At this time, DeYoung had no authority to accept a resignation,
hire, or fire employees. Peck called DeYoung back at 11:30 a.m.,
but he told her he had not yet spoken to Buchholz.

Eventually DeYoung told Buchholz that Peck had resigned.
Specifically, DeYoung stated that Peck became upset and said:
"Just take the phone out of my house, I quit." Two meetings took
place concerning Peck's alleged resignation and whether a verbal
resignation was valid. After consulting with his manager, John
Schwartz, Buchholz determined that he had the discretion to
accept a resignation over the phone and declined to discuss the
issue with Peck at all. At about 2:00 p.m., DeYoung, at
Buchholz's direction, called Peck to confirm her resignation
which Peck continued to deny making. Peck called the Human
Resources Department twice that day contesting her "resignation."
Later, Aldrich called Peck to inform her that the resignation was
effective at the end of the day. No one followed up on Peck's

_____

[5] Another worker at NGM apparently had the reputation of
harassing his employees to the point that they would quit.

8

allegations that she had not resigned.

## II. DISCUSSION

### A. Standard of Review

It is axiomatic that a court does not find facts in ruling on a motion for summary judgment. Instead, the court construes the evidence in the light most favorable to the nonmovant and determines whether the moving party is entitled to judgment as a matter of law. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988); accord National Amusements, Inc. v. City of Dedham, No. 91-1176, slip op. at 27 (1st Cir. Jan. 4, 1995) (reasonable inferences are those that indicate an acceptable level of probability based on common sense and human experience). Where the nonmovant bears the burden of proof at trial, summary judgment should be denied if the nonmovant produces "more than a scintilla" of supporting evidence which, if believed, would be sufficient to convince a reasonable fact finder that the nonmovant's claim has been proved. Milton v. VanDorn Co., 961 F.2d 965, 969 (1st Cir. 1992). Similarly, when the moving party bears the burden of proof at trial, summary judgment is warranted only if the movant is entitled to judgment as a matter of law on the undisputed material facts. Fitzpatrick, 2 F.2d at 1116. With these standards in mind I address the defendants' motion.

9

**B.    The Equal Pay Act Claim**

To establish a violation of the Equal Pay Act ("EPA") a plaintiff must prove that

> (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort, and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; and (3) the male employees were paid more under such circumstances.[6]

Tidwell v. Fort Howard Corp., 989 F.2d 406, 408 (10th Cir. 1993); Waters v. Turner, Wood & Smith Ins. Agency, Inc., 874 F.2d 797, 799 (11th Cir. 1989) (per curiam) (quoting Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974)); Brownlee v. Gay & Taylor, Inc., 642 F. Supp. 347, 361 (D. Kan. 1985), aff'd, 861 F.2d 1222 (10th Cir. 1988).  While the compared jobs need not be identical, the plaintiff must prove that the jobs require substantially equal skill, duties, supervision, effort, and responsibilities. Forsberg v. Pacific Northwest Bell Tel. Co., 840 F.2d 1409, 1414,

---

[6] The New Hampshire statute uses similar language as the EPA.  See N.H. Rev. Stat. Ann. § 275:27.  Although there are no cases from the New Hampshire Supreme Court indicating the standard to be used under the statute, both parties rely on federal law as it is developed under the EPA.  Because the parties do not argue that the state law standards differ from the federal precedents cited, I assume that state law provides no greater protection.  See Mesnick v. General Elec. Co., 950 F.2d 816, 829 n.11 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992).

modified, 46 Empl. Prac. Dec. (CCH) ¶ 37,996 (9th Cir. 1988); accord Corning Glass, 417 U.S. at 196; Lex K. Larson, Employment Discrimination, § T51.42 (2d ed. 1995). Further, in assessing whether the jobs are substantially equal "'[t]he controlling factor ... is job content--the actual duties of the respective employees are called upon to perform'" Waters, 874 F.2d at 799 (quoting Pearce v. Wichita City, 590 F.2d 128, 133 (5th Cir. 1979)). This inquiry is a fact based determination and therefore should be assessed on a case-by-case basis. Forsberg, 840 F.2d at 1414. But cf. Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994) (failure of proof of essential element by nonmovant renders all other facts immaterial and summary judgment should be granted), cert. denied, 63 U.S.L.W. 3817 (U.S. 1995).

If a plaintiff proves her prima facie case, the defendant may escape liability by proving that the unequal pay is caused by: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex. 29 U.S.C.A. §206(d)(1); Winkes v. Brown Univ., 747 F.2d 792, 793 (1st Cir. 1984) (citing Corning Glass, 417 U.S. at 196-97).

Peck bases her Equal Pay Act claim on the disparity between her pay and DeYoung's pay. NGM argues that it is entitled to

11

summary judgment on the claim both because Peck has not offered enough evidence to support her claim that the compared jobs involve substantially equal work, and because the undisputed facts establish that the pay differential was due to factors other than sex. Reviewing the evidence in the light most favorable to Peck, I find that neither argument entitles NGM to the relief it seeks. First, while Peck's evidence that the compared jobs involve substantially the same skill, duties, supervision, effort, and responsibility is far from compelling, it is not so weak that it falls below the "more than a scintilla" standard that this circuit employs when reviewing summary judgment claims against the party with the burden of proof. See Milton, 961 F.2d at 969. Second, I agree with Peck that the facts material to NGM's claim that the differential is based on factors other than sex remain sufficiently murky so as to preclude summary judgment on that basis. Thus, I deny defendants' motion for summary judgment on the Equal Pay Act claim.[7]

---

[7] NGM remains free to renew its summary judgment arguments in a motion for judgment as a matter of law at the conclusion of the plaintiff's case. See Fed. R. Civ. P. 50.

## C.   The Fair Labor Standards Act Claim

Peck claims that she is entitled to relief under the Fair Labor Standards Act ("FLSA") because she was required to work uncompensated overtime.  The FLSA provides in pertinent part that no employer shall employ an employee for more than forty hours per week unless the employee receives compensation for the overtime at a rate of one and one half times their regular rate. 29 U.S.C.A. § 207(a).  To prove that an employer has violated the FLSA, an employee must show that: (1) she actually worked overtime; (2) the amount and extent of overtime was shown by justifiable and reasonable inference; and (3) the defendant had knowledge, actual or constructive, of her work.  Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986).  NGM argues that summary judgment should be granted because Peck cannot meet her burden on any of these elements.

### 1.   Whether Peck actually worked the overtime

An employee is entitled to overtime pay under the FLSA only if she actually worked the overtime and not if she merely was waiting to be engaged in work.[8]  Kelly v. Hines-Rinaldi Funeral

---

[8]  At oral argument, Peck agreed that the time necessary to fill out her reports would amount only to twenty to thirty hours per week.  Therefore, as counsel agreed at oral argument, in

13

Home, Inc., 847 F.2d 147, 148 (4th Cir. 1988) (no overtime for waiting time), cert. denied, 493 U.S. 835 (1989). "Work" means "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer ... ." Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944). Waiting or down time may be work because "[r]efraining from other activity often is a factor of instant readiness to serve ..." an employer. Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944). Therefore, whether an employee is actually working or is merely waiting to be engaged in work depends upon whether the time in question is spent for the employer's rather than the employee's benefit. Id.; accord Martin v. Ohio Turnpike Comm'n, 968 F.2d 606, 609 (6th Cir. 1992) (per curiam), cert. denied, 113 S. Ct. 979 (1993); Shamblin v. City of Colchester, 793 F. Supp. 834, 835 (C.D. Ill. 1992); 29 C.F.R. § 785.15. If an employee could not utilize her spare time effectively for normal pursuits, then the time is compensable and is not waiting time. 29 C.F.R. § 785.15. This does not mean, however, that an employee's

---

order for Peck to show she actually worked the overtime, she must demonstrate that she was engaged to wait, not merely waiting, during the time she was not completing forms or performing the other tasks.

flexibility during waiting time must be identical to that during non-waiting time because to allow such a rule would enable nearly all waiting time to be compensable. Owens v. Local No. 169, 971 F.2d 347, 350-51 (quoting Brown v. Houston N.W. Medical Ctr. Survivor, Inc., 934 F.2d 671, 677 (5th Cir. 1991) (en banc), cert. denied, 502 U.S. 1036 (1992)), modified, 30 Wage & Hour Cas. (BNA) 1728 (9th Cir. 1992). There is no bright line test; rather the determination is a question of degree, taking into account all the circumstances. Armour, 323 U.S. at 133; accord Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); Berry v. County of Sonoma, 30 F.3d 1174, 1180 (9th Cir. 1994) (predominant factors are agreement between parties and freedom to engage in personal activities), cert. denied, 115 S. Ct. 1100 (1995); Owens, 971 F.2d at 351 (same); Birdwell v. City of Gadsen, 970 F.2d 802, 808 (11th Cir. 1992) (same plus practical agreement of parties by conduct and relation of nature of services to waiting time).

Peck contends that she could not leave her house from 6 a.m. until 8 p.m. because she was required to be available to underwriters and agents during regular business hours as well as to insureds who may need to return her calls either before or after regular business hours. Further, she alleges that she was

15

required to remain in her home in order to keep her "no hit" ratio below one percent, a fact she was commended for by NGM. Drawing all reasonable inferences in her favor and accepting her testimony as true, Peck was unable to leave her home during periods of inactivity, which is an indication that she was engaged to wait rather than merely waiting to be engaged. See Lurvey v. Metropolitan Dade Cty., 870 F. Supp. 1570, 1579 (S.D. Fla. 1994); 29 C.F.R. § 785.25

Peck also received rush requests quite often, at least once, but sometimes three to four times per week. Her ability to respond quickly to these requests was cited as a strength on her evaluations. The frequency of these requests and NGM's requirement that she respond to the rush requests immediately restricted her ability to utilize the waiting time for her own pursuits. Compare Kelly, 847 F.2d at 148 (three calls per month not frequent enough to be unduly restrictive on employee's time) with Renfro v. City of Emporia, 948 F.2d 1529, 1538 (10th Cir. 1991) (four to five calls per day unduly restricted fire fighters waiting time), cert. dismissed, 503 U.S. 915 (1992).

In addition, because Peck was the only person doing telephone inspections on a regular basis, these responsibilities could not easily be shifted or traded to other employees at NGM.

16

See <u>Miner v. B & C Equip., Inc.</u>, No. 93-35401, 1994 WL 198692, **3 (9th Cir. May 18, 1994) (even though plaintiff did not often trade, because he could have traded on call time easily, he was not entitled to overtime compensation); <u>Kelly</u>, 847 F.2d at 148 (plaintiff not entitled to overtime where phone would be answered by others if plaintiff did not respond). <u>But</u> <u>see</u> <u>Bright</u>, 934 F.2d at 672 (employee not entitled to overtime where only on-call employee and required to respond to all calls because could go anywhere while on-call with pager). In fact, Peck attempted to have DeYoung do several telephone inspections to aid her in dealing with her backlog, but most of these inspections were returned to Peck incomplete.

Finally, Peck states that she did not engage in any personal activities from 6 a.m. through 8 p.m. Instead, she claims that she did all her grocery shopping, cleaning, eating, sleeping and socializing on the weekends and after 8 p.m. during the week, except for occasionally loading the dishwasher. She also stated that if the phone rang while she was eating she would interrupt her meal to answer the call. A reasonable jury, based on all of the surrounding circumstances, could find that Peck's waiting time was primarily for NGM's benefit. <u>See</u>, <u>e.g.</u>, <u>Kelly</u>, 847 F.2d at 148 (employee effectively used waiting time because slept); 29

17

C.F.R. § 785.19 (not off duty if required to perform duties while eating). Thus, Peck has offered sufficient evidence that she actually worked overtime to overcome NGM's summary judgment motion on this issue.

### 2. Whether the amount of overtime was shown by justifiable and reasonable inference

NGM argues that, based on plaintiff's production level and the nature of her additional tasks, there is no reasonable basis to infer that her job required any overtime. They point to DeYoung's June 1993 report which indicated that the bulk of Peck's calling occurred in the morning and in the late afternoon leaving large gaps in her day unaccounted for. Absent a showing that she was continuously working during this time, the defendants contend that there is no basis for drawing the reasonable inference that she actually worked the overtime.

In evaluations, however, Peck was lauded for her flexibility in reaching insureds at off times and for maintaining a no hit ratio of less than one percent. At the time of these evaluations, the evaluator knew the Peck was concerned about the amount of hours she spent working. Further, Peck informed NGM staff that she was available to insured parties from 6:00 a.m. until 8:00 p.m. and management confirmed this availability.

18

Finally, Peck's backlog and the managing of that backlog were of great concern to NGM. Therefore, a reasonable jury could find that Peck's proof demonstrates through justifiable and reasonable inference that she worked uncompensated overtime. See Pforr v. Food Lion, Inc., 851 F.2d 106, 108 (4th Cir. 1988) (need only show amount of uncompensated overtime by just and reasonable inference).

### 3. Whether NGM had actual or constructive knowledge that Peck was working the overtime

An employee must also demonstrate that her employer had actual or constructive knowledge of the overtime. Newton v. City of Henderson, 47 F.3d 746, 748 (5th Cir. 1995); Davis, 792 F.2d at 1276 (where employer suffer or permits the overtime, it acts with knowledge of the overtime) (citing 29 U.S.C.A. § 203(g)). In meeting this requirement, an employee need not make a contemporaneous request for overtime so long as the employee establishes that the employer knows and permits the employee to work the overtime. Forrester v. Roth's IGA Foodliner, Inc., 646 F.2d 413, 414 (9th Cir. 1981). Alternatively, even if the employer has knowledge of the overtime, the employer may be relieved of liability if it repeatedly instructs the employee not to work the overtime. See Lindow v. United States, 738 F.2d

19

1057, 1062 n.3 (9th Cir. 1984). Nevertheless, "[t]he mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so." 29 C.F.R. § 785.13.

Peck contends that NGM had actual knowledge of her overtime because she told several supervisors and managers, including Aldrich, Buchholz, and DeYoung, that she was working all day and felt burnt out from the hours and her inability to leave her home. In a memo to his files, Buchholz acknowledged that Peck had made these comments. Both Mary Graves and Deborah Hannon, Peck's former supervisors, also acknowledged that Peck had made the comments. Drawing all reasonable inferences in Peck's favor, a reasonable jury could find that NGM had knowledge of her overtime hours.

Furthermore, Peck denies that anyone at NGM instructed her not to work those hours, although NGM contends that several individuals instructed her to only work a split shift. In addition, despite some recommendations as to how to more effectively organize her day, no one at NGM implemented or enforced these recommendations. Thus, there are genuine issues of material fact as to whether NGM promulgated a rule prohibiting Peck from working the overtime and whether, even if they did, it

20

was enforced.  Therefore, I deny NGM's motion for summary judgment with respect to this claim.  <u>See</u> Fed. R. Civ. P. 56.

**D.    The Wrongful Discharge Claim**

To prevail on a claim for wrongful discharge, an employee must prove that the employer (1) terminated the employment (2) out of bad faith, malice or retaliation and (3) because the employee performed acts which public policy would encourage or because the employee refused to perform acts prohibited by public policy.  <u>Short v. School Admin, Unit No. 16</u>, 136 N.H. 76, 84, 612 A.2d 364, 370 (1992).  NGM argues that it is entitled to summary judgment on Peck's wrongful discharge claim because Peck has not established that NGM acted with malice directed at her and because the acts Peck claims are encouraged by public policy amount to nothing more than the questioning of managerial policy.

**1.    Bad faith**

Bad faith is the equivalent of malice in the context of a wrongful discharge claim.  <u>Centronics Corp. v. Genicom Corp.</u>, 132 N.H. 133, 140, 562 A.2d 187, 191 (1989); <u>accord</u> <u>MacDonald v. Tandy Corp.</u>, 796 F. Supp. 623, 627 (D.N.H. 1992) (bad faith where company knew that termination was unreasonable and still decided to terminate employee), <u>aff'd</u>, 983 F.2d 1046 (1st Cir. 1993); <u>Godfrey v. Perkin-Elmer Corp.</u>, 794 F. Supp. 1179, 1187, 1187 n.7

21

(D.N.H. 1992) (company's failure to investigate employee's sexual harassment complaint or remedy discriminatory practices sufficient evidence of bad faith). Specifically, the manner in which an at will employee is discharged may support a conclusion that the employer was motivated by bad faith or malice. Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 921, 436 A.2d 1140, 1144 (1981) (employee of 36 years suspended after five minute meeting and terminated in cursory manner supported conclusion employer acted in bad faith). Peck worked for NGM for nearly twenty years and received excellent evaluations. Despite many years of good service, Peck was terminated after two short phone calls with her supervisor regarding an issue that had already been resolved the previous month. Further, Buchholz refused to acknowledge her dispute with DeYoung's story despite learning she had called human resources to dispute that she had resigned. Under these circumstances, Peck has offered sufficient evidence to survive a motion for summary judgment claiming the sufficiency of her proof of bad faith.

### 2. Public Policy

"'Unless an employee at will identifies a specific expression of public policy, he [or she] may be discharged with or without cause.'" Id. at 920, 436 A.2d at 1143 (citations

22

omitted). Although a specific public policy must be identified, the expression of that policy need not be found in a statute nor must it be "so strongly stated that its existence would be established ... as a matter of law." Bourque v. Town of Bow, 736 F. Supp. 398, 401 (D.N.H. 1990) (citing Cloutier, 121 N.H. at 922, 924). Nevertheless, "an employee's expression of disagreement with a management decision is not an act protected by public policy." Short, 136 N.H. at 85, 612 A.2d at 370 (business reasons exception to prohibition against retaliatory discharge in violation of public policy); accord Miesowicz v. Essex Group, Inc., Civil No. 91-667-JD, slip op. at 4 (D.N.H. Apr. 12, 1994) (termination for disagreement with management policy not actionable even if discharge is harsh or unfair). Whether a public policy exists is usually a question for the jury unless the absence of a policy is so clear that the court can rule as a matter of law. Short, 136 N.H. at 86, 612 A.2d at 371; Cloutier, 121 N.H. at 924, 436 A.2d at 1145 (existence of public policy requires multifaceted balancing test properly left to jury's determination).

Peck cites two acts that public policy would encourage: (1) questioning her status with NGM after becoming suspicious that NGM was attempting to fire her; and (2) attempting to obtain

23

relief from her overtime obligations. Whether either of these alleged public policies are sufficient to support her wrongful termination claim involves a question of fact that must be left to the jury to resolve. Therefore, I deny defendant's motion for summary judgment on this claim. See Fed. R. Civ. P. 56(c).

**E.    The Intentional Interference with Contractual
       Relations Claim**

Peck claims that the individual defendants intentionally interfered with her employment relationship with NGM. In order to prove intentional interference with contractual relations, the plaintiff must show: (1) the existence of an economic relationship with a third party; (2) the defendant knew of that relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference. Soltani v. Smith, 812 F. Supp. 1280, 1296 (D.N.H. 1993). Whether an employer can be deemed a third party where the defendants are employees of the employer, depends upon whether the individual defendants acted within the scope of their employment. See id. at 1297; see also Alexander v. Fujitsu Business Communication Sys., Inc., 818 F. Supp. 462, 470 (D.N.H. 1993); Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 663, 429 N.E.2d 21, 24 (1981) (freedom to effect corporate

24

purpose should not be curtailed by fear of individual liability). "[A]n individual [is] not acting within the scope of his employment if his decision 'was motivated by actual malice', where 'actual malice' is defined as 'bad faith, personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff.'" Soltani, 812 F. Supp. at 1297 (emphasis omitted); see also Daigle v. City of Portsmouth, 129 N.H. 561, 580, 534 A.2d 689, 699 (1987) (act performed in furtherance of business is within scope of employment).

Defendants argue that plaintiff's claim must fail because the individual defendants were acting within the scope of their employment, and therefore, NGM cannot be considered a third party.[9] In response, Peck contends that whether the individual defendants were acting within the scope of their employment is a factual determination for the jury.

_____

[9] Defendants also argue that this claim is deficient because plaintiff inconsistently contends in her respondeat superior count (Count VII) that the individual defendants were acting within the scope of their employment. I agree with plaintiff with respect to this portion of the defendants' argument. The statements in Count VII with respect to vicarious liability, although inconsistent with this count, are permissible under Fed. R.Civ. P. 8(e)(2).

25

## 1. DeYoung

Peck asserts that DeYoung acted in bad faith in fabricating the story about her resignation in order to avoid his responsibilities as her supervisor.  In support of her claim, Peck offers evidence that DeYoung's evaluations and raises suffered because of his failure to properly undertake his supervisory responsibilities and that he demonstrated an unwillingness to either supervise or communicate with Peck.  She argues that a reasonable jury could infer from this evidence that DeYoung acted with spite or hostility towards Peck in relaying the false story that she had quit.  I agree.  Thus, DeYoung is not entitled to summary judgment with respect to this claim.

## 2. Buchholz and Schwartz

Peck has failed to identify any evidence to support her claim that Buchholz and Schwartz acted beyond the scope of their employment.  Thus, both defendants are entitled to summary judgment with respect to these claims.

## F. Other Claims

## 1. Negligent Supervision

Peck argues that NGM and Buchholz negligently failed to supervise NGM's employees in such a way as to prevent them from (1) unreasonably terminating other employees; (2) discriminating

26

against other employees; and (3) causing other employees to work excessive hours without compensation. Although the New Hampshire Supreme Court has recognized a tort of negligent supervision in limited circumstances, see Cutter v. Town of Farmington, 126 N.H. 836 (1985), plaintiff concedes that the court has never extended the tort in the manner plaintiff suggests. Moreover, several other jurisdictions have rejected efforts to expand the tort to cover claims such as those that plaintiff seeks to raise. See, e.g., Pulson v. Davis, 895 F.2d 705, 710 (10th Cir. 1990); Maxey v. M.H.M., Inc., 828 F. Supp. 376, 378 (D. Md. 1993); Chesapeake & Potomac Tel. Co. v. Dowdy, 365 S.E.2d 751, 754 (Va. 1988); . In the face of this conflicting precedent, I decline to recognize a right of action that has not yet been authorized by the New Hampshire Supreme Court. See Putnam Resources v. Pateman, 958 F.2d 448, 470 (1st Cir. 1992); Public Serv. Co. v. Hudson Light & Power Dept., 938 F.2d 338, 346 (1st Cir. 1991). Accordingly, I grant defendants' summary judgment motion with respect to this claim.

2. **Respondeat Superior/Vicarious Liability**

In Count VII, Peck asserts that NGM is liable for the actions of the individual employees based on the theory of respondeat superior. Trahan-Laroche, slip op. at 3 (citations

27

omitted). Plaintiff's remaining claims do not assert that the individual defendants engaged in any actionable conduct for which NGM can be vicariously liable.[10]  Therefore, resort to theories of indirect liability to recover from NGM are inapposite.  Thus, I grant defendants' motion for summary judgment with respect to this claim.

### III.  CONCLUSION

For the foregoing reasons I grant in part (Counts IV (against Buchholz and Schwartz), VI, and VII), and deny in part (Counts I, II, III, IV (against DeYoung) defendants' Motion for Summary Judgment (document no. 18).

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

June 21, 1995
cc:  Gordon Rehnborg
     Joseph Hoppock

---

[10]  While Peck's claim against DeYoung for intentional interference with contractual relations survives, the basis for that claim is that DeYoung acted outside the scope of his employment.  Therefore, even if respondeat superior liability were applicable in this case, it is not a basis to hold an employer liable if the employee acts outside the scope of his or her employment.