Rubinstein v. Circuit City Stores     CV-97-484-SD  02/10/99

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


<u>Barry Rubinstein</u>


     v.                              Civil No. 97-484-SD


<u>Circuit City Stores, Inc.</u>



                        O R D E R


     In August 1997 plaintiff Barry Rubinstein brought this

action in Hillsborough County (New Hampshire) Superior Court

against his former employer, defendant Circuit City Stores, Inc.,

with state-law claims of wrongful discharge, breach of contract,

and intentional infliction of emotional distress.[1]  Circuit City

removed the case to federal court in September 1997.  This court

has jurisdiction pursuant to 28 U.S.C. § 1332.  Before the court

is Circuit City's motion for summary judgment[2] on all counts, to

_____

     [1]Plaintiff has since waived the intentional infliction of
emotional distress claim.  <u>See</u> Order of October 22, 1997.

     [2]A memorandum of law in support of summary judgment shall
not exceed twenty-five pages.  Local Rule 7.1(a)(3).  In support
of a summary judgment motion, a memorandum of law shall
"<u>incorporate</u> a short and concise statement of material facts,
supported by appropriate record citations, as to which the moving
party contends there is no genuine issue to be tried."  Local
Rule 7.2(b)(1) (emphasis added).  In the future, defendant should
adhere to the local rules by incorporating its statement of
material facts into its memorandum of law rather than providing
them <u>in addition to</u> its memorandum of law.

which plaintiff objects.  Also before the court is defendant's motion for leave to file a reply memorandum and plaintiff's objection thereto.

## Background

This action arises out of an investigation of a Circuit City sales associate, Ron DeCoste, who worked in one of the Circuit City stores within Rubinstein's district.

Rubinstein began working for Circuit City in January 1993 and was promoted to the position of district manager in October 1996.  As a district manager within Circuit City's Northeast Division, Rubinstein supervised personnel in six stores in New Hampshire, Maine, and Massachusetts.  The personnel within these stores were individually supervised by store managers who reported to Rubinstein.  Rubinstein's direct supervisor was Bob Brant, general manager for the Northeast Division of Circuit City.  Rubinstein did not have an employment contract with Circuit City; he was hired as an "at-will" employee.

In the spring of 1997, DeCoste altered several Circuit City sales tickets by reducing the purchase price of a product after the completion of a purchase and adding on the price of an Extended Service Plan (ESP).[3]  This was done to make it appear

------

[3]An Extended Service Plan guarantees the operation of a particular product beyond the period of the manufacturer's warranty.

2

that DeCoste had sold ESPs to customers when in fact these customers had no knowledge that the service plans were included as part of the sale. Circuit City set ESP sales goals for each region, district, and store, and trained sales associates in techniques for selling ESPs. Circuit City put pressure on sales associates and managers to achieve their ESP goals with daily monitoring[4] of ESP sales and regular ESP contests between Circuit City districts and regions. Rubinstein's immediate supervisor, Bob Brant, had informed Rubinstein to "do whatever it takes" to achieve ESP goals for his district, and in turn Rubinstein had passed this message along to the employees within his district.

On June 3, 1997, DeCoste's store manager, Jane Carosiella, informed Rubinstein that she suspected DeCoste of improperly adjusting a sales ticket to reflect an ESP sale, and she wanted to know what she should do about it. Circuit City maintained a policy under which all managers were required to immediately report Circuit City policy violations to a supervisor, to Circuit City's Loss Prevention Department (Loss Prevention), or to Circuit City's Human Resources Department. On the same day that Carosiella informed Rubinstein of her suspicions, Rubinstein sought advice from another, more experienced district manager, Bob McKinney, about how he should handle this situation. After

_____

[4]On weekends ESP sales were often monitored on an hourly basis.

3

discussing this issue with McKinney, Rubinstein decided to investigate the facts further before reporting any information to his supervisors or Loss Prevention.[5]

About a week later Rubinstein questioned DeCoste about the sales ticket in question. At that time DeCoste gave Rubinstein an explanation that would justify the alteration of the sales ticket. The next day Rubinstein went to the store where DeCoste worked to determine if DeCoste's explanation was accurate or if DeCoste had violated store policies by adjusting a sales ticket. After reviewing sales data from the store, Rubinstein discovered that DeCoste had improperly altered the sales ticket in question, as well as other tickets, with improper ESP purchases. Rubinstein immediately informed Loss Prevention Manager Jerry Campos, who had been present in the store the day of these violations. That same day, Campos and Rubinstein informed Brant and Human Resources Manager Joan Caggiano of these violations. To resolve this matter, DeCoste was put on administrative leave, and Loss Prevention began an investigation regarding DeCoste's ticket alterations.

---

[5]Even though DeCoste may have altered a sales ticket, he could have had a legitimate reason for doing so that did not violate Circuit City's policies. For example, a price could be adjusted for a customer after the sale to match a lower price offered by a competitor. Rubinstein claims that he wanted to know if DeCoste had actually engaged in activities which violated the company's policy before reporting this matter to his supervisors.

On June 13, 1997, the day after Rubinstein reported DeCoste's ticket adjustments to Loss Prevention, he met with his immediate supervisor, Brant, to discuss the situation. Rubinstein alleges that Brant was upset that he might have to fire managers because of ESP alterations and informed Rubinstein that "this is what happens when you don't come to me with this shit first." Rubinstein also claims that after he reported the sales alterations to Loss Prevention, Brant would not return his messages or communicate back to him regarding unrelated routine business matters within the company.

During Loss Prevention's investigation, Rubinstein discovered that another district manager, Kelly Watson, when she was a store manager within his district, had also made ESP alterations on sales tickets similar to those made by DeCoste. He immediately reported this information to Brant. Also during this time, another employee, Tony Oliveri, informed Rubinstein that another of Rubinstein's store managers, George Dovas, had made similar adjustments to sales tickets long before Rubinstein became district manager. Again, Rubinstein immediately reported this information to his supervisors by leaving a phone message with Caggiano, the Human Resources representative for the region.

As part of Loss Prevention's investigation, Phil Hershewe individually interviewed several employees regarding their knowledge of ESP ticket sale alterations, and required each to

sign a written statement at the completion of the interview. DeCoste, Carosiello, McKinney, Rubinstein, Watson, Dovas,[6] and Oliveri were all interviewed regarding their knowledge of and involvement in ticket sale alterations. DeCoste, Carosiello, Watson, and Dovas all stated that they felt significant pressure from Rubinstein to sell ESPs. On June 20, 1997, Hershewe interviewed Rubinstein for at least three hours. Rubinstein alleges that during this interview Hershewe attempted to make him write statements that he used extreme pressure and scare tactics to get his employees to sell ESPs and that he told DeCoste that he would give him a Corrective Action,[7] unbeknownst to the Human Resources Department. When Rubinstein would not agree to write such statements, Hershewe called Caggiano into the interview. When he still would not agree to these statements, Rubinstein claims that Hershewe and Caggiano threatened to report to Division President Randy Stevens that he was not cooperating with

---

[6]Dovas was interviewed twice because it became apparent that he had lied in his initial interview when he denied altering sales tickets to increase his ESP sales. In his second interview, Dovas admitted to altering sales tickets to increase his ESP sale percentage rate several times between early 1996 and the time of the interview. He stated that no one had trained him or showed him how to do these alterations and that he had engaged in other practices in violation of Circuit City's policy during this time period.

[7]Under Circuit City's disciplinary policy, an employee who violates a company policy, rule, or practice may be issued a Corrective Action, which is a written reprimand that is placed within the employee's personnel file.

the investigation.  After receiving these threats, Rubinstein agreed to prepare a written statement during this interview. Rubinstein wrote that he had told DeCoste that he would receive a Corrective Action from Rubinstein without the involvement of Human Resources, but Rubinstein claims he only wrote this because he felt threatened by Hershewe and Caggiano and wanted to complete an interview that he felt had gone on far too long.

After Loss Prevention completed all of its interviews, Mike Simon, Director of Human Resources; Elaine Schramm, Director of Loss Prevention; Randy Stephen, Division President, and Brant reviewed the information and decided to place Rubinstein, Watson, Dovas, and Carosiella on administrative leave.[8]  Soon after his interview with Hershewe on June 20, 1997, Rubinstein was placed on administrative leave for eight days, returning to work in the beginning of July.  Simon, Schramm, Stephen, and Brant also decided that all of the employees who were placed on administrative leave should be given a Corrective Action for violating Circuit City policies.

On the day Rubinstein returned to work, he met with Simon and Brant, who informed him that he would be receiving a Corrective Action for his role in the DeCoste situation. Rubinstein told Simon and Brant that he did not think he had

_____

[8]DeCoste had already been placed on administrative leave as soon as Loss Prevention began its investigation; he voluntarily resigned during the course of the investigation.

violated any of Circuit City's policies and that he should not receive a Corrective Action. Rubinstein claims Brant told him he would be watching him closely and if Rubinstein did anything wrong he would be fired. Rubinstein responded to Brant's comments by telling him that this pressure from Brant was going to make his job very difficult. The next day Rubinstein met with Brant again. Rubinstein claims that during this meeting Brant informed him that he didn't trust him and that he had no authority to act as a district manager. Rubinstein also claims that Brant told him he was not to make any decisions on his own, that Rubinstein had to report to him daily, and that he was not going to communicate back to Rubinstein.

Rubinstein worked for about two weeks after his administrative leave before receiving his Corrective Action on July 15, 1997. In this Corrective Action, Circuit City claimed Rubinstein violated company policy by (1) putting pressure on sales staff to meet certain budget objectives, including telling them to do "whatever it takes;" (2) failing to report DeCoste's improper practices immediately; (3) failing to take appropriate action with respect to DeCoste; and (4) interfering with the company's investigation by discussing it with other employees.

On July 17, 1997, Rubinstein resigned from Circuit City in a written memorandum explaining that he disagreed with Circuit City's recent disciplinary actions against him. Rubinstein did

8

not believe that he would receive any results by taking advantage of Circuit City's open-door policy[9] or the company's Associate Cool Line.[10]  Rubinstein claims that his resignation was inevitable because of the treatment he received from Brant, Simon, and other supervisors after he reported DeCoste's alterations to Loss Prevention.

Prior to receiving a Corrective Action, Rubinstein had an excellent performance record at Circuit City.  He received high ratings in his personnel reviews, he was recognized nationally at Circuit City's Managers of Distinction Workshop for his performance as a district manager, he had just received a performance-based salary increase, and his district consistently ranked high in performance as compared to other Circuit City districts.  There is no indication that prior to the Decoste investigation Rubinstein had intended to leave his position at Circuit City, and Rubinstein claims that his goal had been to become a Circuit City Vice President.

---

[9]Circuit City has an open-door policy under which employees are encouraged to discuss and resolve problems with their supervisors.  According to this policy, employees may take their concerns beyond their immediate supervisor all the way to the President and Chairman of Circuit City if necessary.

[10]Circuit City's Associate Cool Line provided a means by which employees might resolve conflicts and other work-related problems with a member of Human Resources.

## Discussion

### 1. Standard of Review

The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Accordingly, at this stage of the proceeding, the court does not weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue of fact for trial. See Stone & Michaud Ins. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). The substantive law identifies which facts are material so that "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" Caputo v. Boston Edison Co., 924 F.2d 11, 12-13 (1st Cir. 1991) (quoting Anderson, supra, 477 U.S. at 248).

The party seeking summary judgment bears the initial burden of establishing the lack of genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992).

10

As a result, the court must view the entire record in the light most favorable to the non-moving party, "'indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once a defendant has submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, supra, 477 U.S. at 256.

2. Wrongful Discharge

a. Constructive Discharge

Circuit City contends that the events leading up to Rubinstein's departure from Circuit City do not support the allegation that plaintiff was wrongfully discharged from his position, constructively or otherwise. "'Through the use of constructive discharge, the law recognizes that an employee's "voluntary" resignation may be, in reality, a dismissal by the employer.'" Godfrey v. Perkin-Elmer Corp., 794 F. Supp. 1179, 1186 (D.N.H. 1992) (quoting Seery v. Yale-New Haven Hospital, 554 A.2d 757, 761 (Conn. App. Ct. 1989) (citation omitted)). To establish a claim for constructive discharge, the evidence must support a finding that "'"the new working conditions would have

11

been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."'" Greenberg v. Union Camp Corp., 48 F.3d 22, 27 (1st Cir. 1995) (quoting Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986) (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977))). The applicable legal standard is objective, requiring an inquiry into the state of mind of a reasonable person. See Greenberg, supra, 48 F.3d at 27. Therefore, a claim for constructive discharge cannot hinge on an unreasonable reaction to one's work environment. See id.

A plaintiff can legitimately be said to feel compelled to resign under a number of scenarios. A constructive discharge may occur when an employee's resignation resulted from new working conditions that were particularly humiliating or demeaning; for example, by exposing him or her to ridicule in front of clients. See Greenberg, supra, 48 F.3d at 27 (citing Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. 1992)). Likewise, a demotion or reduction in pay are also relevant considerations. See id. (citing Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888-89 (3d Cir. 1984)). The First Circuit has also recognized that direct or circumstantial evidence of discriminatory animus can substantiate the intolerable nature of one's working conditions. See id. at 28 (citing Acrey v. American Sheep Indus., 981 F.2d 1569, 1574-75 (10th Cir. 1992)).

12

Circuit City contends that no reasonable person could find that Rubinstein was constructively discharged. In support of this contention, defendant states the following three points: (1) Rubinstein resigned just two days after he received a corrective action from his immediate supervisor, Bob Brant; (2) Brant was justified in reprimanding Rubinstein with a corrective action based upon Loss Prevention's findings during the ticket alteration investigation; and (3) Rubinstein cannot claim he was constructively discharged merely because he felt his job performance had been unfairly criticized. See Defendant's Motion for Summary Judgment at 10. Even assuming these assertions to be true, the more pertinent question is whether sufficient evidence exists to support a finding that Rubinstein's working conditions became so difficult or unpleasant that he was forced to resign.

In support of his claim, plaintiff alleges not only that supervisors above him, including Brant, put undue pressure on him and other lower-level managers and employees to increase ESP sales, but also that these supervisors were trying to hold him personally responsible for ESP sales alterations rather than accept their own responsibility for these violations. To conceal their own responsibility for unethical practices by lower-level employees, plaintiff alleges his supervisors retaliated against him when he reported unethical ESP sales activities by engaging

13

in a hostile interview with him, placing him on administrative leave, and issuing him a corrective action.

Rubinstein's claim is strengthened when one considers the conduct of Brant, his immediate supervisor, after Rubinstein reported DeCoste's ticket alterations to Loss Prevention. For instance, Rubinstein claims that the day after he informed Loss Prevention of the alteration, Brant acted very upset when he met with him to discuss the situation, and claimed, "this is what happens when you don't come to me with this shit first." Rubinstein Affidavit ¶ 8. Plaintiff also claims that Brant failed to communicate with him several times thereafter by not returning his phone calls or email messages regarding routine business matters. See id. As soon as Rubinstein returned to work from administrative leave, Brant informed him during a meeting with Brant and Human Resources Director Simon that he would be watching Rubinstein closely and he would be fired if he did anything wrong. Finally, plaintiff claims that the following day Brant informed plaintiff he didn't trust him and told him he had no authority to act as a district manager and all of his decisions had to be approved by Brant, to whom plaintiff was to report daily. See id. Despite plaintiff's attempts to follow Brant's instructions, Brant refused to respond to plaintiff. Plaintiff claims he could not perform his job under these conditions.

In addition, plaintiff has provided circumstantial evidence of a retaliatory animus that is arguably adequate to support a finding of constructive discharge. In cases brought under federal anti-discrimination statutes, courts considering constructive discharge claims have looked at whether adverse action has been taken in retaliation for a protected act. See, e.g., Hart v. University Sys. Of New Hampshire, 938 F. Supp. 104, 107 (D.N.H. 1996). In these cases, the fact that the complained-of actions were motivated by discriminatory or retaliatory animus makes the actions intolerable where they otherwise might not be. See Greenburg, supra, 48 F.3d at 28 ("evidence of a discriminatory animus could help substantiate a claim that one's working conditions had become intolerable"). "Circumstantial evidence of retaliation may include the differential treatment of the employee in the workplace, '. . . temporal proximity of an employee's protected activity to an employer's adverse actions and comments by the employer which intimate a retaliatory mindset.'" Mullenix v. Forsyth Dental Infirmary for Children, 965 F. Supp. 120, 150 (D. Mass. 1996) (quoting Mesnick, supra, 950 F.2d at 828 (footnote omitted)). For example, in Hart, supra, 938 F. Supp. at 107, this court found it significant to plaintiff's constructive discharge claim that the employer's request for plaintiff's resignation and his reduction of her pay and hours followed shortly after plaintiff had complained to her

employer about gender discrimination.  Likewise, to suggest that Rubinstein would no longer be effective as a district manager, based upon the findings of this one investigation relating to the alteration of ticket sales, is hard to believe considering Rubinstein's previous performance evaluations, which even noted plaintiff's ability to cooperate with and lead his subordinates. Viewing the evidence in the light most favorable to Rubinstein, it is significant that Rubinstein's direct supervisor, Brant, instituted new working conditions only after Rubinstein informed Circuit City's Loss Prevention Department of the improper ESP ticket sale alterations within Brant's region.

A final consideration is whether Rubinstein took reasonable measures to correct or mitigate the unfavorable situation he was in before tendering his resignation.  Defendant argues that Rubinstein's failure to take advantage of the Associate Cool Line or use Circuit City's open-door policy precludes a finding of constructive discharge.  It is true that in many cases a "victim of unlawful discrimination is expected to seek legal redress while still employed unless actually fired." Cazzola v. Codman & Shurtleff, Inc., 751 F.2d 53, 55 (1st Cir. 1994) (citing Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119-20 (1st Cir. 1977)). However, an employee is not required to actually pursue internal grievance procedures if he or she can show that following such avenues would have been a futile exercise.  See Woodward v. City

of Worland, 977 F.2d 1392, 1402 (10th Cir. 1992) (noting tangentially that if employee could reasonably perceive that lodging an internal complaint would have been futile, constructive discharge may have occurred), cert. denied, 509 U.S. 923 (1993); cf. Clowes, supra, 991 F.2d at 1161 n.6 (noting that filing an internal grievance is not required in all cases).

From Rubinstein's perspective, he did attempt to pursue his employment concerns with his supervisors, and found this process to be futile. For instance, on several occasions Rubinstein spoke with Brant about his disagreement with the company's recent actions against him. In addition, the threats to report Rubinstein to the division president when he would not agree to Hershewe's statements, as well as other communication between Rubinstein, Hershewe, and Caggiano during Rubinstein's extensive Loss Prevention interview, sent a clear message to Rubinstein that these supervisors were trying to place at least some of the blame on him for DeCoste's actions. Finally, although Rubinstein did not file a formal grievance with a supervisor above Brant, he did speak with the Human Resources Director for the Northeast Division, Mike Simon, regarding his concerns about the corrective action against him and how he thought the company had improperly misplaced the blame on him for ESP ticket sale alterations within Brant's region. Considering his discussions with Brant, Simon, Hershewe, and Caggiano, this court cannot say that Rubinstein

17

failed to explore alternative avenues before concluding that resignation was his only option. For the abovementioned reasons, this court finds that plaintiff has alleged sufficient evidence for a reasonable jury to conclude that he was constructively discharged.

### b. Elements of Wrongful Discharge

By acting in retaliation for his reporting activities and creating a hostile work environment that forced him to leave, plaintiff alleges that Circuit City wrongfully discharged him. "In New Hampshire, absent a written employment contract, legislation, judicial exception, or a collective bargaining agreement, employment such as plaintiff's is deemed to be employment at will." Godfrey, supra, 794 F. Supp. at 1186 (citing Panto v. Moore Business Forms, Inc., 130 N.H. 730, 739, 547 A.2d 260, 267 (1988)). A judicial exception, however, provides that recovery may be had for wrongful discharge if the employee proves the defendant was motivated by bad faith, malice, or retaliation, and the discharge resulted because the employee performed an act that public policy would encourage, or refused to do something that public policy would condemn. See Wenners v. Great State Beverages, 140 N.H. 100, 103, 663 A.2d 623, 625 (1995) (quoting Short v. School Admin. Unit 16, 136 N.H. 76, 84, 612 A.2d 364, 370 (1992)), cert. denied, 516 U.S. 1119 (1996);

18

<u>Cloutier v. Great Atlantic & Pacific Tea Co.</u>, 121 N.H. 915, 921-22, 436 A.2d 1140, 1141 (1981).

Defendant argues that Rubinstein's claim of wrongful discharge fails for essentially two reasons. First, defendant argues that even though Rubinstein disagreed with the treatment he received from Circuit City surrounding the DeCoste incident, there is insufficient evidence to show that Circuit City improperly retaliated against him. In addition, defendant argues that there is insufficient evidence to show that Circuit City forced Rubinstein to resign because he acted in a manner encouraged by public policy.

Despite defendant's assertions that Rubinstein was treated differently after the DeCoste investigation only because he did not promptly report ESP sales violations, Rubinstein does provide sufficient evidence to suggest an alternative, retaliatory motive on Circuit City's part. As discussed previously, the retaliatory conduct of Rubinstein's supervisors, including Brant's change in Rubinstein's work conditions which led to Rubinstein's departure, was only imposed after Rubinstein reported unethical ESP sales violations within Brant's region. Brant's comment to Rubinstein, "this is what happens when you don't come to me with this shit first," was stated only after Rubinstein reported ESP sales violations to Loss Prevention. Clearly, information that employees altered sales tickets to increase their ESP sales so

they could achieve company goals would be embarrassing to both the company and to Brant, who actively promoted ESP sales. A reasonable person could infer from Brant's comment and the conduct of Rubinstein's supervisors thereafter that Circuit City was retaliating against Rubinstein because Rubinstein had exposed the company's problem of ESP sales violations. In addition, until Rubinstein reported ESP sales violations to Loss Prevention, defendant thought he was an excellent employee. In over four years of employment with defendant, Rubinstein had never been reprimanded and had received very favorable employee evaluations. Only after Rubinstein reported unethical ESP sales violations in Brant's region did Brant and other Circuit City supervisors question Rubinstein's abilities as a manager. As noted by the New Hampshire Supreme Court, "the manner in which the plaintiff was discharged" may serve as an underlying predicate for a finding of bad faith. See Cloutier, supra, 121 N.H. at 921.

In regard to the public policy requirement, Rubinstein alleges that his reporting of other employees' actions he believed to be unethical to defendant was consistent with public policy. He also alleges that this question of public policy is one of fact better left for the jury. "Although the existence or nonexistence of a public policy is ordinarily a question of fact for a jury, the court may, when appropriate, rule as a matter of

20

law whether a public policy does or does not exist." <u>Kopf v. Chloride Power Electronics</u>, 882 F. Supp. 1183, 1189 (D.N.H. 1995) (citing <u>Short</u>, <u>supra</u>, 136 N.H. at 84, 612 A.2d at 370). Addressing the problem of unethical sales transactions as Rubinstein did appears to be an action that public policy would promote. Nonetheless, in instances where the existence or nonexistence of a public policy is not so clear cut, this question is more appropriately determined by the jury. <u>See Cloutier</u>, <u>supra</u>, 121 N.H. at 924; <u>Cilley v. New Hampshire Ball Bearings, Inc.</u>, 128 N.H. 401, 406, 514 A.2d 818, 821 (1986) ("The issue of whether a public policy is implicated in an employee discharge should be taken from the jury only when the public policy's existence can be established or not established as a matter of law . . . ." (quotation omitted)).

Rubinstein has identified an act on his part that the jury could find was supported by public policy, and he has provided evidence from which a reasonable jury could infer that Circuit City retaliated against him because of his actions that were consistent with public policy. For the abovementioned reasons, defendant's motion for summary judgment as to wrongful termination must fail.

## 3. Breach of Contract

According to New Hampshire law, employees are either contract employees or at-will employees. See Censullo v. Brenka Video, Inc., 989 F.2d 40, 42 (1st Cir. 1993) (citing Panto, supra, 130 N.H. at 267). Contract employees are limited in their remedies for breach by the terms of the contract, while at-will employees are limited in their remedies to claims for wrongful discharge. See Censullo, supra, 989 F.2d at 42. "[U]nless an employment relationship explicitly provides for a definite duration, it is presumed to be at-will." Smith v. F.W. Morse & Co., 76 F.3d 413, 426 (1st Cir. 1996).

Plaintiff does not allege that an express employment contract existed between Circuit City and Rubinstein that would modify Rubinstein's at-will employment status. Instead, from the complaint, plaintiff appears to allege that the policies and procedures governing disciplinary proceedings in defendant's employee handbook created an implied contract that modified Rubinstein's at-will employment status. Specifically, plaintiff alleges in the complaint that defendant breached its contract with Rubinstein when it conducted an investigation and imposed discipline in a retaliatory manner which was in conflict with the employee handbook.

Unilateral offers like those in employee handbooks may create restrictions on the manner in which an employer terminates

22

its employees.  See Lowry v. Cabletron Systems, Inc., 973 F. Supp. 77, 83 (D.N.H. 1997) (citing Butler v. Walker Power, 137 N.H. 432, 435-36, 629 A.2d 91, 93-94 (1993); Panto, supra, 130 N.H. at 737-39).  However, an employer may show its intent not to modify the at-will status of an employee and prevent being bound by policies within its employee handbook by making specific disclaimers illustrating such intent.  See Butler, supra, 137 N.H. at 434-36.

In this case, is clear from the record that defendant did not intend to be bound by policies within its employee handbook or otherwise modify its at-will relationship with Rubinstein. Plaintiff admits that when he began working for Circuit City, he read, understood, and signed an employment application form which specifically stated the following four things regarding his at-will status as an employee: (1) his employment was at-will; (2) his employment could be terminated by either party with or without cause at any time; (3) his at-will employment relationship was to remain in effect throughout his employment with Circuit City unless modified by a specific, express written employment contract signed by defendant; and (4) his at-will employment relationship was not to be modified by any oral or implied agreement.  In light of this evidence, the court finds that Circuit City did not modify its at-will relationship with

Rubinstein through its employee handbook; thus Rubinstein's contract claim must fail.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment (document no. 26) is denied as to Count I, but is granted as to Count II. Defendant's motion for leave to file a reply memorandum is denied as moot (document no. 28).

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

February 10, 1999

cc:   Eleanor H. MacLellan, Esq.
      Barry Needleman, Esq.
      Philip J. Joss, Esq.